Max N. Tobias, Jr., Judge
ItThe defendant, Tyrone Wells, appeals his conviction and sentence for second degree murder. Finding no reversible error, for the reasons that follow, we affirm his conviction and sentence.
STATEMENT OF THE CÁSE
Tyrone Wells (hereafter “Wells” or “the defendant”) was charged, by a grand jury indictment on 28 August 2003 with first degree murder, a violation of La. R.S. 14:30. He pleaded not guilty at his 3 September 2003 arraignment. Trial proceeded in March 2009; however, the jury was unable to reach a verdict and a mistrial was declared. Wells- second trial commenced in October 2009 beginning with a Wither-spoon voir dire pre-selection of jurors lasting for 11 days in October. The formal trial began on 30 November 2009 with eleven jurors being selected, sworn and sequestered. Trial recommenced on 4 December 2009 when one additional juror and alternates were selected and sworn. A verdict was rendered on 16 December 2009, finding Wells guilty of second degree murder. His motion for new trial was denied on 20 May 2010, and he was sentenced on 18 June 2010 to mandatory life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This timely appeal followed.
REACTS
• Wells was convicted of the 11 July 2003 murder of Jose A. Vazquez, Jr. (hereafter, “Jose” or “the victim”).

THE STATE’S CASE

Testimony of Kimberly Vazquez

Kimberly Vazquez (“Kimberly’))’ Jose’s widow, testified that she and Jose had been together for twelve years, married for eight at the time he was killed, and residing together at 5323 Venus Street in New Orleans, directly behind the family’s restaurant. A back gate in their- residence fence allowed one to enter upon the restaurant property and into the rear door of the restaurant.
On the morning of 11 July 2003, Jose arose at about 4:51 a.m., went into the restroom, prepared to leave, kissed his wife goodbye, said goodbye to the puppies, turned off their home alarm, exited through the front door, resetting its alarm, and drove off in his truck. Kimberly got *239 up, turned on the television and -a lamp, before receiving a call informing her that the restaurant’s alarm had gone off. She tried to call the restaurant and Jose’s cellphone a number of times but got no answer. When the alarm company called a second time, Kimberly asked them to please dispatch the police because something was wrong. Kimberly replied in the negative when asked whether she knew the defendant, had ever seen him before this incident, or had ever seen him at the restaurant.
She stated that the alarm company called their residence, and she told them her husband was not home. She confirmed that the alarm company called her mother-in-law, then called her back with a question as to whether her mother-in-law had understood what the company had asked of her about the alarm company dispatching the police to the restaurant in response to the alarm. Kimberly stated I athat at that point she. told them to dispatch the police. She confirmed that she and Jose had no children. She testified that she believed her father-in-law reopened the restaurant approximately a week after the funeral.

Testimony of John Stokes, Jr.

John Stokes, Jr. testified that in June 2003 he was employed by' the' United States Army, Department of Defense, and a company commander for 377th Theatre Support Command, stationed at 5010 Leroy Johnson Drive, in New Orleans, on Lake Pontchartrain. His unit had a written food contract with the Vazquez Seafood Restaurant that took effect on 8 June 2003, pursuant to which the restaurant was to cater breakfast and lunch to the unit, with the members of the unit eating dinner at the restaurant. The contract was in effect on 11 July 2003. The victim would personally set up ánd serve breakfast in the Reserve Center, usually arriving between 6:00 and 6:30 a.m.

Testimony of Julio Guzman

Julio Guzman, owner of J&J Alarms, testified that J&J provided security/ burglar alarms for the doors and the motion detector inside the Vazquez Seafood Restaurant. Two doors were in the front of the restaurant and one in the rear; all were on the same alarm zone. He described how when one enters the restaurant through either the entry/exit, “entry delay” doors at the front or the rear, the keypad would beep for thirty or forty seconds until one turned it off. He said that if not turned off within that time a signal would be reported to “command central” or “central station;” he confirmed on cross 'examination that “a different company” monitored the alarm. He said that if entry was made through a non-entry delay door, the alarm signal would be sent immediately.
I ¿Mr, Guzman explained that special instructions for the restaurant’s alarm account were for “command central” to call relatives (he later said the relatives were supposed to be Jose or Jose Vazquez, Sr.) before the police were called and dispatched. This was due to prior false alarms and a city ordinance mandating fines for false alarms exceeding a certain number. Mr. Guzman identified an exhibit[1] as a report generated as a result of the alarm going off at the Vazquez Seafood Restaurant on ■ 11 July 2003, reflecting an entry/exit through one of the “entry delay” doors at 5:17:44 a.m., which he later confirmed was actually thirty seconds after the entry, when the signal went to command central that the alarm Code had not been entered at the keypad to turn it off. The' report reflected that a “restore” was made at 5:17:50 a.m., which was when command central received an indication that *240 the door had closed after the entry six seconds earlier. The report reflected that calls were made to relatives, and a second entry/exit was made through either the front or rear entry delay doors at 5:23:45 a.m.
Mr. Guzman testified on cross examination that the keypad to turn off or set the alarm was in the rear of the restaurant. He confirmed that if the alarm is not deactivated/ turned-off within thirty seconds, a signal is sent to the alarm command central alerting it that the alarm had not been deactivated/ turned off. He stated that the- keypad would eventually stop beeping and no alarm siren was present at the restaurant itself. The report reflected that command central got no telephone response at the restaurant. The report reflected that eight attempts were made to contact Jose Vazquez, Sr. Mr. Guzman confirmed the presence of an entry at 5:34 a.m. and a variety of later entries. He further confirmed on redirect examination |Bthat motion detectors were installed in the restaurant; everything shown in the report as “zone 2” triggers would be motion detectors being triggered.

Testimony of Andrea Taylor

Andrea Taylor, the New Orleans Police Department (“NOPD”) Assistant Police Communications Specialist, identified two exhibits, respectively, as an incident recall and 911 recording of 11 July 2003 under NOPD item #G-19464-03, a signal 30-C, denoting a homicide by cutting at 5328 Franklin Avenue, the “Vazquez Restaurant.” The incident recall reflected that the first 911 call was received at 5:35 a.m. from a caller named “Jose.” EMS was notified at that same time. The incident recall réflected that the alarm company called 911 at 5:37 a.m.
Ms. Taylor confirmed on cross examination that the call from “Jose” was that his son (Jose) had been stabbed inside the restaurant. She confirmed that a call at 5:41 a.m. reflected that an armed robbery with a gun was involved and the possible perpetrator was an employee. A police officer reported at that same time that two subjects were down inside the location.

Testimony of Jose Vazquez, Sr.

Jose Vazquez, Sr. (hereafter, “Mr. Vazquez”) testified that he was originally from Cuba and had been in the United States for forty-one years. He worked as.a welder for approximately ten years before going into the grocery business. He and his son, Jose, later opened the restaurant as co-owners and operators, doing everything from cooking to cleaning the floors. In 2003, he lived on St. Roch Avenue, approximately five blocks away from the victim’s home and the restaurant. He said his son would get to the restaurant around 5:00 a.m. or earlier to get the breakfast ready for an Army contract. But he would leave through the front door around 2:00 p.m. on banking days, enter his vehicle, and drive to the 16bank to make deposits of the previous day’s receipts, which he said could be between $2,500 and $5,000. He would return from the bank with coins in various denominations for the cash register, transporting the money in a bank bag. The money was kept in a desk located in a locked small office.
Mr. Vazquez testified that 11 July 2003 was a Friday, and Thursday’s receipts were in the locked office that morning. When he received the call about the alarm, he got dressed, gathered his identification, his wallet, and his gun, and drove to the restaurant. From inside his parked car in front of the restaurant, he observed someone inside the restaurant with a backpack on his back, limping toward the rear of the restaurant. He drove to the rear of the restaurant, believing that it was a robbery and that the person would attempt to exit through the rear door. The back gate was *241 closed and chained. He saw no movement, so he drove around to the front of the restaurant. When he could see no movement at the front, he returned to the rear. He telephoned his wife, who informed him that she had talked to their son’s wife, who had told her that Jose was inside the restaurant. At that point Mr. Vazquez drove to the front of the restaurant, exited his car, and entered the restaurant with his gun in his hand. He identified two exhibits as photos of the same scene (one enlarged) depicting his car parked in the front of the restaurant. Mr. Vazquez saw Jose lying on the floor with the defendant a few feet from him. He said he kicked a pistol away that was near the defendant’s hand. He noticed some tables and chairs on the floor. He said he was pointing his gun at the defendant’s head, and the defendant kept telling him to kill him (“kill me, kill me”). Mr. Vazquez said he could hardly understand the defendant, and he did not recognize him. He moved to his son, touching him about his face and realized he was dead. He then called 911. Mr. Vazquez identified the recording as his 911 l7call. He returned to his son and inspected the scene. He noticed two sets of keys next to his son’s body. A little farther away were a knife and the magazine of a pistol.
Mr. Vazquez’s second 911 call was played for the jury, during which call he informed the operator that the defendant worked at the restaurant. He said he initially believed this because they used to have an employee with a foot problem who walked with a limp. He said he realized the defendant was not an employee or former employee when the police arrived and queried him about that. He said police permitted him to inspect the rear of the restaurant. Mr. Vazquez said that nothing had been done in the kitchen, and he noticed streaks of blood on the door in two locations. He found eggs that Jose had brought to prepare breakfast on top of a small table where the alarm keypad/control panel was located. He also identified photographs of the scene. Mr. Vazquez described a sliding rear chain-link gate secured with a chain that one would have to unlock before being able to slide it .open to access a small open fenced-in area and the rear door of the restaurant. The solid rear door had a keyed deadbolt lock and a missing door handle. He said the door handle had broken off perhaps a few weeks, prior to 11 July 2003. Inside the rear door, and closing over it, was an iron mesh door that Mr. Vazquez stated he would open but only to kept flies out. He identified two exhibits (and the enlarged corresponding identical photos) as photos of the rear door, depicting the deadbolt lock and missing door handle, as well as the bloodied door handle stem, which he said one had to grasp to turn the door latch to open the door. He said it was not easy to open the door without the handle.
Mr. Vazquez testified that when the coroner came to remove his son’s body through the rear door, the police called him to open the rear door, which was | ^unlocked. He grasped the door handle stem and opened the door. He said the outside sliding back fence gate was locked with the chain, and he had to open the lock (presumably a padlock) with a key. Mr. Vazquez testified that when he reentered the rear of the restaurant, he went into the office to find it “a disaster,” identifying two exhibits as depicting the narrow and shallow office. He said the paper money was still in the rear of a desk drawer hidden behind papers. A lock had been broken on the separate desk drawer in which coins were kept. He acknowledged that he reopened the restaurant approximately one week later;
Mr. Vazquez confirmed that an individual named Michael Ricks contacted him-after the murder with some information, but *242 he told Mr. Ricks to give the information to detectives. Someone also sent him a letter after the murder, which he gave to a police captain who patronized the restaurant.
■ On cross examination, Mr. Vazquez stated that he did -not know whether his son was worried that he may have had a sexually transmitted disease. This was not something that his son revealed to him. When asked whether his son took him into his confidence, Mr. Vazquez replied that his son always did so. When asked whether it was fair to say that his son did not discuss his medical condition with him, Mr. Vazquez testified that his son would tell him that he would visit the doctor for stomach problems or other problems that he had. When-asked whether, it was. fair to say that he knew very little, if anything, about his son’s sexual activity, Mr. Vazquez replied that such things were “super private,” and sometimes one knows some things, sometimes one does not.
Mr. Vazquez confirmed on cross examination that he spoke to a police officer and a Detective Green on the day of the crime, and he was aware of a police report in the case prepared by a Detective Green. Mr. Vazquez confirmed that the [¡¡alarm instructions were that when an alarm was triggered, the alarm monitor/command central was to first call the restaurant, then, if no one answered, to call Jose, and if he did not answer, then to call him. The alarm monitor was not to call the police unless it received authorization-from him or his son. This procedure was followed because of a ■ large number - of previous false alarms.
Further, Mr. Vazquez testified that Jose did not have problems with any person on the day he was killed, and he replied in the negative when asked whether Jose had confided anything of that nature to him, Mr. Vazquez confirmed that he had received a telephone call at some point from Michael Ricks, who was in the (prison) hospital in a bed next to the defendant. He also confirmed that approximately a month or., two later, Mr, Ricks visited him at the restaurant. He understood that Mr. Ricks had previously visited the restaurant a few times, but he did not recognize him. Mr. Vazquez again confirmed that on the day of the murder, the bag of paper money was still in the drawer where he kept it, but the coins had been disturbed and were spread'around the office. He recalled that the police gave him his son’s wallet, but he said they did not give him his son’s cell phone; He believed his son owned three guns.
On redirect examination, Mr. Vazquez confirmed that he found the outside rear gate locked that morning and did not unlock it until he did so for the coroner’s office. He testified that the rear door to the restaurant was not locked, and he did not have to use a key to open it that morning. He stated on re-cross examination that he had not been shown any photographs of the rear outside gate.

Testimony of Thomas Kennedy

| mThomas Kennedy, a retired NOPD Officer/Crime Scene Technician, testified concerning the preservation of the 11 July 2003 crime..scene at the Vazquez Seafood Restaurant — the photographing, diagram-ing, and collection of evidence at that scene under the direction of the lead investigator. He identified an exhibit as his report in the case; another exhibit as an enlargement of a diagram of the crime scene; and a number of photographs (many of them enlarged).
He collected a bloodied pistol and knife, as well as a backpack, from the dining room floor, all depicted in the crime scene photos. The backpack contained a cap, two nickels, three pennies, and a live (unfired) .380 cartridge. Another live .380 cartridge *243 was recovered a couple of yards away from the backpack. Four other live .380 cartridges were contained in the pistol magazine that was also found on the dining room floor near the bloodied knife. A spent bullet/pellet was found on the floor in the office. Seventeen blood samples were collected from the restaurant; none was taken from the backpack.
A number of the crime scene photographs depicted blood on tile floors and carpet, walls, the rear door, and door knob stem; one of the two white swinging doors leading into/out of the kitchen; a Lorcin .380 caliber pistol; the knife and pistol magazine on the tile floor; the black backpack; overturned chairs; papers scattered about the office; the desk top; and inside a desk drawer. Retired Officer Thomas testified that he recovered one spent cartridge case from inside the gun that had not been ejected after being fired.
Retired Officer Thomas confirmed on cross examination that the failure to eject the spent cartridge case jammed the gun. He said he did not collect any of the coins depicted in photograph/enlargement, which were scattered on the floor of the office near the front of the desk chair. The spent bullet/pellet collected as evidence |nwas located underneath the rear of that chair, as depicted in that same photograph/enlargement.

Testimony of Lawrence Rivera

Lawrence Rivera testified that on 11 July 2003, he was employed as a senior paramedic for the City of New Orleans, New Orleans Health Department. Upon his arrival at the crime scene, he entered the restaurant with police officers and proceeded to secure the scene, primarily making sure that no threat existed inside. He described the defendant’s location inside as lying on the other side of the counter from Jose, in the beginning of the rear part of the restaurant, an area depicted in a previously identified photo/enlargement. Mr. Rivera further testified that there was a backpack and some change around that area. He asked the defendant what happened, and the- defendant replied that there was a robbery and “they” went out the back. Mr. Rivera testified that he and police followed a blood trail and went through the swinging doors into the kitchen, where they also inspected a walk-in cooler to make sure no one was inside. He said the blood trail led to the rear door. The rear door had blood on the stem of the missing door handle, and he attempted to push the door open, but it would not open. He did not put his hand on the door handle stem. Mr. Rivera testified that the blood trail was from (or to) the defendant and the rear door.
Mr. Rivera testified that the defendant had a major abdominal wound through which organs were protruding, which he referred .to as a massive evisceration. The defendant also had several puncture wounds on his leg and was in critical condition. He later testified on cross examination that the defendant probably would have died within thirty minutes, had he noj; been taken to the hospital. The defendant did not relate what happened to him, meaning he did not |12say “I was stabbed” or “I was shot,” something Mr. Rivera found unusual, given his experience in responding to what he said were hundreds and hundreds of shootings and stabbings. Mr. ■ Rivera identified an exhibit as his ambulance call report. He testified that during the defendant’s transport to the hospital, he asked the defendant if he was an employee of the restaurant; the defendant told him he was not.,Mr. Rivera later testified on cross examination that the defendant had told them when they first arrived that he was an employee.
Mr. Rivera further stated that he asked the defendant in the ambulance: “[D]id you *244 do this and he looked at me and said yes, and then, a few minutes later, he said — he said to me I can’t believe I did this, I can’t believe I did this, I can’t believe I did this;...” Mr. Rivera testified that the defendant’s condition improved once placed in the ambulance and given IVs. Mr. Rivera had never been to the Vazquez Seafood Restaurant before he responded there on 11 July 2003; he had not been there since; and he did not know Mr. Vazquez or any of the Vazquezes.
Mr. Rivera admitted on cross examination that nothing was present in his report specifically stating that the defendant told him that he was not an employee. He testified that he put “unclear” in his report as to that issue. He did not put in his report what the defendant said in the ambulance: “I can’t believe I did this.” However, he testified that he gave this information to the police.
On redirect examination, Mr. Rivera stated that he told police “the exact conversation” he had with the defendant in the rear of the ambulance. He read aloud from a transcript of his prior testimony from the defendant’s first trial (in March 2009). Mr. Rivera was asked at that first trial: “At that point, you had no idea. As I understand, as far as you knew, there was some sort of armed robbery. You didn’t know who the perpetrator [sic] — you didn’t know who was the | ^victim?” His answer to that question was: “Correct. At that particular point in time no, but it was later made clear to me.” He explained at the present trial that what he was referring to in that answer at the first trial was his conversation with the defendant in the back of the ambulance en route to the hospital, during which it was made clear to him who the “victim” in the incident was. He elaborated that it was not so much a conversation as his asking the defendant and the defendant answering. He testified that although the defendant was wearing an oxygen mask he, Mr. Rivera, was still able to communicate with him — the defendant could hear him and he could hear the defendant. Mr. Rivera testified that the defendant was alert throughout. However, he also said the defendant was in shock, and he initially could only get a carotid pulse, which meant that the defendant’s arterial blood pressure was less than sixty. He said an arterial pressure of about fifty-five to sixty is needed to keep one’s brain functioning — but he said the defendant had that. He then gave the defendant 700-l,000cc of lactate and saline to replace the blood volume he had lost from bleeding, and his blood pressure went to 104/62 by the time he arrived at the hospital.. He documented that the defendant was alert and oriented from the time he examined the defendant in the restaurant until he arrived at the hospital.

Testimony of Jessica Condiff

Jessica Condiff testified that she and Wells resided together as a couple for two to three months during 2003, but that by 11 July 2003, they had broken up and she was living with her mother. She confirmed that they still kept in contact after their breakup. She acknowledged that she purchased a handgun in July 2003 when the defendant was with her. Ms. Condiff identified an exhibit as a “firearms registration” signed by her and dated 7 July 2003 — four days before defendant | )4killed the victim. The “Firearms Transaction Record” reflected her 7 July 2003 purchase of a .380 caliber Lorcin Model L380 semiautomatic pistol, serial number 476936, along with a store receipt from Top Dollar Pawn for that firearm. When shown an exhibit, a firearm, Ms. Condiff stated that it looked like the gun she purchased on 7 July 2003. She testified that in July 2003, she owned a 2003 Chevrolet Cavalier automobile and she kept the gun *245 in the glove compartment. She let the defendant borrow her car on the night of 10 July 2003 because he was going out with his brother-in-law and some male friends. She last saw him about 11:00 p.m. that night. She confirmed that at the time, Wells was living with his mother or with his sister in a residence around the corner from her mother’s residence, where she was living. He had previously used her car when they lived together. She learned on the morning of 11 July 2003 that the defendant had been injured. She left her residence to go the hospital, but her car was not there. Wells’ sister drove her to the hospital, where she was interviewed by a police detective, who questioned her about the defendant, her car, and her gun. She was later questioned by Detective Troy Williams at police headquarters.
Ms. Condiff testified that her sister, Erica Condiff, worked at the Vazquez Seafood Restaurant “for a moment.” Ms. Condiff later testified on cross examination that her sister worked at the restaurant some six months before the crime in question. She confirmed that the defendant knew that her sister worked at the restaurant, recalled one occasion when the defendant picked her sister up from work at the restaurant, and that the defendant had been to, apparently inside, the restaurant on that occasion.
Ms. Condiff testified on cross examination that she was/ had been a teacher for five or six years. She stated that she met the defendant sometime 'in 2002. She 11ficonfirmed she had maintained a close friendship with the defendant’s older sister, Shonda. Ms. Condiff testified that she had a two-year-old son when she met Wells, who had a perfect relationship with her son. The defendant was working as an interstate commercial 18-wheel truck driver when they met. Both she and her son had been on the road with him. She said the defendant lost his commercial driver’s license when a drunk driver hit his truck, which was around the time their romantic relationship ended. When they broke up, the defendant went to live with his sister, Shonda, her two children, and her fiancé. Ms. Condiff estimated she saw Shonda four or five times a week back then. She testified that as of the night before the murder when Wells borrowed her car, he had lined up work with a commercial 18-wheel driver/owner, but was waiting to fully clear up his commercial license before he could begin.
Ms. Condiff testified further on cross examination that she purchased the handgun (and ammunition) in question because she had been victimized in her vehicle while her young son was with her. The salesclerk loaded the gun, and she confirmed that, to her knowledge, it was fully loaded. Ms. Condiff did not recognize the backpack found in the restaurant. She did not know that Wells and Jose knew each other. She testified that approximately a year after the killing, when the defendant was in jail, he told her he had known the victim. She said Wells said he just went there and did not mean to kill Jose. The defendant did not tell her anything about his relationship with Jose, but confirmed that he told her she would learn the full story at some point.
Ms. Condiff confirmed on redirect examination that she had prior conversations with the defendant while he was in jail during the preceding year; he said he knew the victim. She also testified that Wells had put some dents in her car 11fione day when she went to meet a male friend and returned to her home to find him there. Ms. Condiff testified that when the defendant mentioned that he knew the victim and told her she would find out, he asked her not to be mad at him. When asked whether the defendant seemed em *246 barrassed having to reveal something, Ms. Condiff answered “[s]ort of kind of, but I didn’t want to know.”

Testimony of Officer Gordon Hyde

NOPD Officer Gordon Hyde testified that on 11 July 20Ó3, he retrieved the defendant’s clothing from Charity Hospital and logged it into the NOPD Central Evidence and Property Room. He identified an en globo exhibit as copies of three pages of an NOPD evidence and property receipt under NOPD item #G-19464-0S. He also identified other exhibits: two yellow metal earrings with an accompanying form reflecting that fact; a black leather business card holder with numerous cards; a lighter; a camouflage handkerchief; a pair of white tennis shoes; a pair of socks or undershirt; and a pair of jeans. He stated that the items were not in the same condition as they had been in at the time he picked them up from Charity Hospital, noting the date, July 2003, and they had been stored in the below-ground basement of NOPD Police Headquarters (referring to 2005 Hurricane Katrina-related flooding in New Orleans).
Officer Hyde confirmed on cross examination that he had known his cross examiner, Claude Kelly, one of defendant’s lawyers, since grammar school. He confirmed that: the defendant’s clothing was bloody when he retrieved it from Charity Hospital; he spoke to the defendant’s sister, Shonda, her husband, Flynn Forte, and the defendant’s former girlfriend, Jessica Condiff; Jessica Condiff gave him information about her vehicle and the gun; and that he believed that after he | ^interviewed them, they all agreed to meet homicide Detective Williams at the Third District Police Station.

Testimony of Anna Duggar

Anna Duggar, then director of the NOPD Crime Lab, was employed in July 2003 by the Crime Lab in its Forensic Light Unit. She was qualified by stipulation as an expert in the chemical processing and developing of latent finger/palm/foot prints and in blood testing and enhancement. Ms. Duggar recalled that she was asked to examine a firearm and a magazine for the firearm, some live cartridges/rounds, and a knife. She identified an exhibit as three reports generated by her in the present case under NOPD item #G-19464-03. Two of the reports reflected her examination of a silver-colored .380 caliber Lorcin Model L380 pistol, serial number 476936; a silver-colored and black magazine marked “LORCIN,” both with possible bloodstains; and four gold-colored bullets, each head stamped “AUTO CBC 380.” These items had no identifiable latent prints, but swabs of the possible bloodstains on the firearm and magazine were collected. The third report reflected Ms. Duggar’s examination of one Victori-nox Fibrox brand knife with a black plastic handle and possible bloodstains. The knife had no latent prints, but one swab of a blood stain was collected from the handle and one swab from the blade. Two swabs of a blood stain were taken from the inside trigger guard of the firearm.
Ms. Duggar confirmed on cross examination that all evidence was either negative for latent prints or negative for identifiable latent prints. She testified that‘a “gunshot” residue test would determine whether someone possibly fired a gun, was in close proximity to a gun when it was fired, or handled a surface that had been contaminated with gunshot residue. She confirmed that she was not asked to 11sdo a gunpowder residue test on anyone in the present case and, to her knowledge, no request was made to do any such test/analysis. Ms. Duggar replied in the negative when asked whether the NOPD Crime Lab did gunshot residue analyses, explaining that such an analysis is out-sourced to *247 a laboratory equipped with a scanning electron microscope. She testified that to her knowledge, no request was received by the NOPD Crime Lab Forensic Light Unit for analysis of a spent bullet. She confirmed that DNA analysis could potentially determine whether a spent bullet went through human flesh, but stated she would not be aware of a DNA analysis being requested of a spent bullet in the present case; because she was not assigned .to the DNA unit in 2003,. she only examined blood stains on the knife and the gun.

Testimony of Officer Kenneth Leary

NOPD Officer Kenneth Leary was qualified by stipulation as an expert in the field of firearms examination, identification, and ballistics. Officer Leary examined the .380 caliber Lorcin Model L380 handgun, serial number 476936, the spent bullet/péllet, and the spent cartridge casing recovered in the case under NOPD item #G-19464-03. He identified those items of evidence as well as another exhibit, to-wit, a copy of his report on his examination of the items. He explained that the spent bullet/pellet and the spent cartridge casing were fired by/in the .380 caliber Lorcin handgun, serial number 476936. He testified that if someone grabbed the slide of a semi-automatic handgun like the Lorcin, it could prevent the slide from moving rearward to eject a fired cartridge casing. The officer said that in such an event the weapon could not be fired again until the empty casing was manually removed. Officer Leary testified that the magazine for the Lorcin handgun was supposed to accept seven cartridges. On cross | ^examination, he stated that it was fair to say. there was any number of reasons why a firearm might jam.
Testimony of Anne Montgomery .
Anne Montgomery was qualified -by stipulation as an expert in the field of molecular biology and forensic DNA analysis. Referring to a NOPD Crime Lab DNA analysis report, Ms. Montgomery testified that DNA analysis of the swab of the bloodstain taken from the blade of the bloody knife recovered at the crime scene showed that the DNA profile of Jose was “consistent” with his being the major contributor of the DNA derived from that swab. She explained that if this major contributor was not the victim, then, conservatively speaking, she would have to look at ten billion other individuals to find someone else who could have been the donor — i.e., the odds were ten billion to one that the major contributor was someone other than the victim. Ms. Montgomery further testified that she found only two weak indications of a “potential” minor contributor as to that blood sample. She .said she could not exclude Wells as a minor contributor to that DNA, but she could not say more conclusively who that minor contributor was because “[tjhere’s not enough genetic information there.” As to the DNA profile derived from the swab of the bloodstain from the handle of the knife, Ms. Montgomery concluded that the victim’s DNA profile was consistent with the minor contributor and Wells’ DNA profile was consistent with the major contributor.
Ms. Montgomery further testified that, as to the DNA profile derived from one of the swabs taken from the bloodstain on the upper side of the trigger guard of the Lorcin .380 caliber handgun, same was consistent with the defendant “being the DNA donor,” while the victim was “clearly” excluded as the donor of that “single source sample.” She stated that if the defendant was not the donor of that |anblood, then one would have to look at ten billion other individuals, conservatively, to find someone else who potentially could also have that DNA profile and have been the donor. She testified that the lab did not test the second swab of the bloodstain *248 from the gun in order to keep that second swab for any other testing that might be requested, given that the sample “was described as two swabs of blood stain on upper side of trigger guard.” She spoke of a policy not to completely consume a sample just, in case other testing might be requested. She noted that if there was only one swab, half of it would be tested; she later stated on redirect examination that the lab would have tested one-half of each of the two swabs taken from the knife— which she testified on direct examination had been packaged separately, in contrast to the two swabs taken from the gun, which were packaged together in a single package.
Ms. Montgomery conceded on cross examination that because the second swab taken from the bloodstain on the gun was not tested, she had no idea what would be on it. She could not recall how many blood samples were collected from the crime scene. She explained that “at the time,” there was a policy of “limited sample submission” for a given case, explaining that if the lab were asked to analyze every sample collected at every crime scene, the lab would have been inundated and could not process samples. For that reason, submitting agencies were asked to submit them most probative samples, and, if further testing was needed, additional samples could be submitted. Ms. Montgomery confirmed that the lab was never asked to do any other DNA testing beyond what was done, and to the best of her knowledge that was all that was sent to the lab for analysis/testing.

Testimony of Detective Troy Williams

I^NOPD Detective Troy Williams testified that he was the lead homicide detective investigating the killing of the victim on 11 July 2003. He described crime scene photos previously introduced in evidence. He noted two sets of keys on the carpet near the deceased victim displayed in one photo and stated that three sets of keys were recovered, two belonging to either the deceased or the restaurant for various uses, and a third set that did not belong to either the deceased victim or the restaurant. He identified an exhibit as depicting the three sets of keys on the carpet. The detective said he collected that third set of keys, which he identified as an exhibit, and stated it was later used when the search warrant was executed. Asked about his investigation into that third set of keys, Detective Williams testified the set was used to enter the 2003 Chevrolet Cavalier owned,by Jessica Condiff that was found parked around the corner.on the day of the killing, in the 5300 block of Venus Street; the car entered and searched pursuant to a warrant. He said the weapon recovered at the scene was purchased by Ms. Condiff just prior to the killing.
Detective Williams spoke ' with the Vazquez family on 25 July 2003, where he was told that someone identifying himself as Michael Ricks had telephoned, saying he might have information regarding the murder of the victim. He left his contact information, and Mr. Ricks, who was then incarcerated, telephoned him (Detective Williams) from jail on 28 July 2003. The detective arranged to take temporary custody of Mr. Ricks and transport him from Central Lockup to the NOPD Third District Police Station, where a recorded statement was taken from him. He confirmed that Mr. Ricks had been in the jail’s medical unit with Wells after the defendant was released from Charity Hospital. On 4 August 2003, Detective Williams obtained from someone in the Vazquez family (he could not 122recall who), a list of Vazquez Seafood Restaurant employees, having information that there may have been -an inside source who provided information to the defendant. He identified *249 that list as an exhibit, which had been printed on 16 July 2003. He also recalled that on 4 August 2003, someone in the family gave him the name and telephone number of an individual who worked as a security guard in the Gentilly area, who possibly may have seen the victim and Wells in the parking lot of the restaurant just prior to the killing. Detective Williams did so, but she had no .information regarding the murder. He completed his investigation and his report in the case on 20 August 2003.
The detective testified that his partner in the investigation, Detective Lawrence Green, had died in 2007. He confirmed that Detective Green talked with Mr. Vazquez at the scene of the killing, and had included in his report what Detective Green said that Mr. Vazquez had told him.
Detective Williams stated on cross examination that Detective Green took an unrecorded statement from Mr. Vazquez. He confirmed that he had met with Mr. Vazquez on 17 and 26 July 2003, as well as 4 August 2003, but Mr. Vazquez never told him that he had watched anyone through the window of the restaurant that morning limp to the rear of the restaurant, or that he (Mr. Vazquez) had circled the premises twice. The detective confirmed, that he did not arrive at the scene until 6:41 a.m., which was after Wells had been taken to the hospital. He testified that although the EMT report on the defendant stated that he had gunshot wounds to his chest and leg, the detective said that, according to what he later learned, the defendant suffered only knife wounds. He confirmed that none of the paper cash money in the office desk had been disturbed. Detective Williams believed the battle between the victim and the perpetrator began in the office area and spilled |Mout into the restaurant. He also believed that the bloodied knife used had been kept in the office to open mail.
Detective Williams said he was told, that on the night before/early morning hours of the killing, the defendant and friends went to the House of Blues and other clubs, and Wells did not arrive home until around 4:00 a.m. on the morning of the killing. He stated that the evidence on the scene led him to believe it was an armed robbery. Wells was arrested on the day of the killing for murder. Detective Williams confirmed that the victim had $128 on his person at the time he was killed. The detective said he was aware that Michael Ricks had been in jail for domestic violence, admitted that Mr. Ricks told him he was in the medical unit with the defendant at the time of a television-news broadcast about the killing, which was shown sometime after 18 July 2003, and that he never checked to determine whether such a newscast aired.
The detective testified that he believed Mr. Ricks informed him that the means of the defendant’s entry into the restaurant was the front door, and the defendant’s girlfriend, Jessica Condiff, was involved in the crime. Detective Williams stated that as far as he knew, Ms. Condiff was not involved. Mr. Ricks also told the detective there was an inside accomplice possibly named Tameka, Shameka, or Shantel. The detective said there was no such name on the restaurant employee list. He confirmed that the security guard to whom he spoke told him over the telephone that she had seen a short black man (Detective Williams conceded Wells was a short black man) and a white or “Spanish” man standing very close and talking in the parking lot close in time to the killing. Detective Williams stated that he never spoke to EMT Lawrence Rivera and never received any information from Mr. Rivera other *250 than what was contained in the EMT'report.
124Petective Williams further confirmed on redirect examination that Michael Ricks provided him with information that only the perpetrator ’ would have knovm,' He confirmed that the late Detective Green orally summarized ■ for him what Mr. Vazquez, told Detective Green, that Detective Green did not furnish him with any notes he might have taken during the conversation with Mr. Vazquez, and that thus there probably were things Mr. Vazquez told Detective Green that were not in his police report. Detective Williams testified that the rear door with the broken door handle and bare stem appeared to be locked and he did not touch the bloodied handle stem or attempt to open the door. He confirmed that Detective Hyde, who was at the hospital when the defendant was brought in, informed him that he had communicated with the physician treating the defendant, and this physioian informed Detective Hyde that the defendant had not been shot but rather stabbed.
Detective Williams was questioned on cross examination regarding his grand jury testimony concerning Gentilly .area security officer Lydia Coty who said she saw a short black male and a white Hispanic male talking outside the restaurant early on the morning of the victim’s killing. He was asked the question: “[T]hat [scenario] doesn’t sound like someone surprising the victim, does it?” Detective Williams confirmed that he answered: “It did not.” On redirect examination, the prosecutor directed Detective Williams to that same page of his prior grand jury testimony relating to what Ms. Coty told him, where he had stated: “Actually, she believed she saw them. She’s not sure it was Mr. Vazquez [the victim] or Tyrone, [Wells].”

Testimony of Dr. James Traylor

' Dr. James Traylor qualified by stipulation as an expert in the field of forensic pathology; he performed the 11 July 2003 autopsy of Jose. He identified | ¡^two exhibits as his autopsy protocol for the autopsy and a blowup/enlargement of an anatomical wound/injury diagram of the deceased victim from that protocol. Dr; Traylor testified that the victim sustained five1 stab wounds from a single-edge knife blade that were labeled A through E. The order did not denote the sequence in which the wounds were inflicted. Stab wound A, the fatal wound, entered the left upper back, with the back of the knife blade oriented toward the midline of the back. The knife blade in wound A perforated the upper lower lobe of the left lung and penetrated the aorta. Dr. Traylor said he was sure some blood had bled from the wound at the scene, but there was a residual two-liter left hemothorax composed primarily of blood clot. He believed the victim would have been incapacitated due to blood, loss within a couple of minutes after receiving this wound. The wound track length from the surface of the skin to termination in the thoracic aorta was 4.9 inches in length (12.5 cm.).
Stab wound B was to the left upper back several centimeters above stab wound A, oriented in the same direction. Stab wound B was approximately one centimeter in depth. Stab wound C was to the lateral left side wall of the torso to the upper abdomen, with the knife blade perforating the superior aspect of the descending (large) colon resulting in a wound track length of 4.3 inches (11 cm.), oriented slightly left to right, slightly top to bottom, and slightly front to back. Dr. Traylor opined that this wound, if untreated, certainly could have become infected with fecal material leaking into the peritoneal cavity, resulting in peritonitis. Stab wound D was to the left later *251 al chest wall. Stab wound E was to the interior of the right thigh, its deepest depth being one centimeter into the underlying muscle. He stated that all the stab wounds had hemorrhage/blood associated with them and |2fithus the tissue was perfused, meaning that all were inflicted when the victim was alive.
The victim had other sharp-force injuries: (1) a half-centimeter cut to the right ear; (2) a fine diagonally-oriented cut above the right eyebrow; (3) a fine cut to the back of the right hand; (4) a fíne cut to the back/side of the left hand; and (5) a fine cut to the inside of the left wrist. The victim had fresh abrasions over the anteri- or right lower leg just below the knee, on the right side of the right forearm just below the elbow joint, and on both sides of the forehead.
Dr. Traylor testified on cross examination that the deceased was thirty-seven years old at the time of his death, was five feet five inches tall, and weighed 187 pounds. He replied in the negative when asked on redirect examination whether, in the approximately 4,500 autopsies he had so far performed in his career, he had ever seen anyone shot and stabbed in the same exact wound through the exact same location.
The doctor confirmed on re-cross examination that he had conducted hundreds of autopsies on individuals who had died after unsuccessful trauma surgery in which the diagnosis or what the trauma surgeon said occurred differed from his own ultimate conclusion(s). However, Dr. Traylor testified on re-redirect examination that he believed the physician who laid eyes on the trauma patient and performed surgery on the patient would be the best one to evaluate the patient, and that was whom he would want to ask what caused a particular injury.

Testimony of Michael Ricks

Michael Ricks testified that he had been convicted of first degree robbery, possession of cocaine, simple burglary of an inhabited dwelling, and unauthorized' use of a motor vehicle. He confirmed that in the week before 19 July 2003, he was [^incarcerated in the Orleans Parish Prison Medical Observation Unit (“MOU”) after surgery. He was assigned to the third level of a three-bed high bunk bed unit, directly over the defendant’s middle-level bunk bed. Mr, Ricks said he was in jail as a result of a domestic matter involving his girlfriend. On this particular day he was on the telephone in the MOU talking with his attorney when a television newscast about the murder of the victim came on, whereupon a lot of the other inmates were calling out to Wells about his being a subject of the newscast.
Mr. Ricks testified that 'after he- hung up, he was talking with the defendant about his attorney, and the defendant told him that he was in trouble. Wells provided some details of his crime, stating that a female who worked at the restaurant gave him information about money being kept in “the filing cabinets.” Mr. Ricks, said Wells referred to the female as “Meeka” or Ta-meeka,” or “something like that.” The defendant told Mr. Ricks that he had “staked out” the restaurant for a couple/several days,
Wells told him that on the morning of the crime the victim came to work early. The defendant told Mr. Ricks that he approached the victim with a 9mm or .380 caliber gun his girlfriend had purchased from a pawn shop. Wells put the gun to the victim’s side. The defendant stated that once inside the restaurant they had a tussle; the victim wrestled with the defendant, trying to get the gun out of his hand. Wells said the victim, bent his (Wells’) wrists,, pointing the gun at the defendant. *252 The gun discharged and hit him in the chest. The defendant further told Mr. Ricks that: “[H]e got away from him and went to the kitchen area and retrieved a knife and went back and that’s when him and Mr. Vazquez had another confrontation and that’s when he started stabbing Mr. Vazquez and he grabbed the knife with his hand, his open hand, and tried to tussle that away from him.”
12SLater, on cross examination, Mr. Ricks replied “[cjorrect” when defense counsel asked him: “According to you, Tyrone told you that there was a gun, which you told us about, and a knife that Mr. Vazquez had retrieved, is that right?” Mr. Ricks replied “[c]orrect” when defense counsel asked him later on cross examination: ‘Your recollection is Tyrone told you that Mr. Vazquez retrieved the knife from the kitchen?” Wells never told Mr. Ricks that he had gotten any money from the restaurant.
Mr. Ricks continued testifying on direct examination, stating that the defendant told him that after the killing, Mr. Vazquez came and stood over him with a gun, saying “look what you done my son, look what you done my son,” and that at that point the defendant told Mr. Vazquez: “[K]ill me, you MF, kill me....” Wells related to Mr. Ricks that at this point police officers and others arrived at the scene.
Mr. Ricks further testified that at the time he conversed with the defendant in the MOU; he had not spoken to anyone about the investigation. No one save the defendant gave him any details about the case. He stated that after the defendant confided these matters to him, he telephoned his (Mr. Ricks’) then fiancée; she contacted Mr. Vazquez, who gave her the name of Detective Williams or Amanda Masset (a former Orleans Parish Assistant District Attorney). Mr. Ricks acknowledged that he spoke to Detective Williams two or three days later. Detective Williams picked him up and took him to the NOPD Third District Police Station for an interview.
Mr. Ricks related that he had never been to the restaurant, although he said his family lived around the corner from it on Venus Street, and his family had gone there several times. He said he had no personal knowledge of the Vazquez family |29at all. He said that after getting out of jail he once went to the restaurant with his fiancée and his children, but this was after he had given the information to Detective Williams. He later admitted on cross examination, after being confronted with his testimony from the defendant’s first trial that he had eaten at the restaurant once before the crime. Mr. Ricks concluded his direct examination testimony by replying in the negative when asked whether anyone had ever offered or promised him anything in exchange for his testimony. In answering that question, he volunteered thát he had been incarcerated since the defendant confided that information to him, and that at the time of trial, he was “still” incarcerated. He confirmed that he had actually been incarcerated longer than Wells — since before the victim was killed.
On cross examination, Mr. Ricks stated that he had spent a “good part” of his adult life in prison. He further admitted that his fiancée, Tracy, had negotiated with the District Attorney’s Office to move her, him, and his daughter to the North Shore, and receive $1,500. Mr. Ricks stated, however, that this was through a witness/victims’ assistance program, and three days after negotiating that deal, he was arrested. Consequently, he never moved to the North Shore. He admitted that “she,” apparently meaning his fiancée, received the $1,500.
Mr. Ricks further confirmed on cross examination that he was convicted of first *253 degree robbery in Orleans Parish and served at least five years in prison for that. He pleaded guilty to a burglary offense in 2004 in Jefferson Parish and was sentenced to five years imprisonment. He also received a sentence of five years imprisonment for a St. Tammany Parish conviction for possession of cocaine. Mr. Ricks admitted that, when he testified at the defendant’s first trial earlier in 2009, he was incarcerated. He had been free on parole but it had been revoked for not |snreporting to his parole officer. He was subsequently in a work release program but walked away from it. At the time of the present trial, Mr. Ricks had a pending charge of simple escape.
On cross examination, Mr. Ricks admitted again that he was jailed on 18 July 2003 on a domestic abuse battery charge (a violation of a stay-away order) lodged by his fiancee, Bridget Benton, with whom he had once been living. He admitted that she had filed several charges against him for domestic abuse in the months leading up to his jailing. It was Ms. Benton who telephoned Detective Williams for him after his conversation with Wells in the MOU.
Mr. Ricks confirmed on cross examination that he told Detective' Williams that the defendant informed him that he staked out the restaurant for a period of time and determined that no deposits were being made. Mr. Ricks was confronted with his statement, presumably the one given to Detective Williams, in which he said that the female employee of the restaurant whom Wells told him provided him the information, “[sjtill works there.” He admitted that at the defendant’s first trial he testified that it was a former employee. He attributed that to a mistake or error. He testified at the present trial that it was an employee who worked there who gave Wells the information. Mr. Ricks was confronted with his previous testimony that during the struggle Jose shot Wells twice, whereas at the present trial he testified that the defendant was shot once, and that in his statement to Detective Williams, he had stated it was once. He stated that he had no idea how many times the defendant was shot, expressed confusion by defense counsel’s questioning, and finally said the defendant was shot twice. .
Mr. Ricks further confirmed on cross examination that Wells told him that he (the defendant) had also robbed Canal Bell Grocery (or Supermarket). He |S1 admitted that he had not given this information to Detective Williams despite the fact that his (Mr. Ricks’) family owned that grocery/supermarket, and Mr. Ricks had worked there at one time. Mr. Ricks conceded that, although he testified on direct examination at the present trial that the defendant told him the bloodied knife found at the scene had been procured from the kitchen, he had testified at the first trial that he had no idea where the knife came from. He noted at one point that “common sense” would lead one to infer that the knife had been procured from the kitchen. In concluding his cross examination, Mr. Ricks said the defendant confirmed that he had said that if there was proof of the nonexistence of the airing of any news broadcast of the Vazquez restaurant killing after 18 July 2003, then one could call him a “liar.”
On redirect examination, Mr. Ricks confirmed that what came on television while he and the defendant were in the MOU was not a full news story about the murder, stating that it was only a commercial (“teaser”) for a news story. Mr. Ricks replied in the negative when asked whether he knew before talking to the defendant in the MOU that day who Jessica Condiff was or whether she had purchased the gun from a pawn shop. He similarly indicated that he did not know before then of the *254 struggle over the gun or that Mr. Vazquez, stood over the wounded Wells afterward and that Wells told Mr. Vazquez, three times to kill him.

Testimony of Dr. Jason Cundiff

Dr. Jason Cundiff testified that he completed a general surgery residency at LSU School of Medicine that encompassed trauma surgery, thoracic surgery, oncology surgery, and all other disciplines under the Board of Surgery. He noted that LSU in New Orleans probably had one of the strongest trauma residency ^experiences in the country because of the high level of crime and trauma in the city. He said that the LSU surgical residency program had a greater proportion of months allocated to trauma surgery than most programs. Dr. Cundiff testified that part of the evaluation and assessment of someone presenting with penetrating trauma involves the “mechanism of injury,” or how the body was injured. He said it is imperative that one determine where the injury is, get to it, treat it, and not miss.anything. He said that once a determination is made in the emergency room that a surgical issue exists, the matter becomes the trauma surgeon’s- domain, and the treatment of the patient is removed from the emergency room physician’s and staffs sphere of influence. Dr. Cundiff stated that when one has penetrating wounds that are “equivocal” as to the cause, no better way exists to find out and treat the patient than going into the operating room.
Dr. Cundiff confirmed that he was working in the emergency room at the time Wells was brought in on 11 July 2003. The EMS report was that he had been shot in the abdomen and chest and was unstable in terms of his blood pressure. Once the defendant’s clothes were cut away, Dr. Cundiff observed a sort of L-shaped curved incision- or wound in the right upper quadrant of his abdomen, with evisceration — in this case some fatty substance was protruding out, called omentum, which he said was the fatty covering next to the intestines. He turned the defendant over and examined his back, noticing a small lesion in the middle of the .lower back, adjacent to the spine. Noting the EMS report of a gunshot wound, Dr. Cundiff said that he probed the wound and found it to be one centimeter deep at most; he was unable to push a Q-tip down any further into the wound beyond the spine. He said this told him the wound came from the back and it stopped very quickly, hitting the spine or the bony prominence of the spine.
IsaDr. Cundiff explained that they placed the defendant on his back and got some “fly-by” x-rays in an effort to detect any lead or even a broken-off knife blade in the chest or abdomen — “even a miniscule piece of metal in there.” No foreign bodies were detected in the defendant. Wells had a collapsed lung, requiring the placement of a chest tube to re-expand it. Dr. Cundiff was asked about the role of Dr. Aruna Akundi in treating the defendant, and he said he believed her role could have been that of the traditional emergency room physician, which, upon determining that surgery was required, made sure the defendant was stable before he went up to the operating room. He indicated that Dr. Akundi was not in the operating room when he operated on Wells. Dr. Cundiff identified an exhibit as the defendant’s medical records from his treatment in the hospital, including his own operative report.
The doctor confirmed that there was EMS and emergency room documentation that the defendant had a gunshot wound to his abdomen and chest. Dr. Cundiff detailed his exploration of Wells’ abdomen, noting that he was operating under the assumption that the injury was a possible *255 gunshot wound. He opened the defendant’s abdominal cavity, packed it to soak up and staunch further bleeding, and suctioned out accumulated blood. He then sutured one blood vessel from a muscle at the site of the L-shaped wound, which stopped any major bleeding, to his surprise, considering the amount of blood in the abdomen. He removed all the packing and systematically explored the abdomen. He found a one-centimeter laceration on the front part of the liver oozing a little bit of blood, which was directly underneath the blood vessel he had sutured. He said no exit wound existed and no metal was in the abdomen. He also noted that a bullet creates a lot of tissue damage. He opined that in his educated opinion the major |S4wound was a stab wound. He said the onercentim-eter deep wound to the back that he probed from the skin to the bony portion of the defendant’s spine clearly was not a gunshot wound.
Dr. Cundiff confirmed that references existed throughout the defendant’s medical record as to the defendant having sustained a gunshot wound, some made even after the doctor had performed the surgery. But he testified that these references were not the result of other individuals evaluating and diagnosing the defendant, but rather it was one of a mistake being repeated over and over. He stated that anything in terms of diagnosis find final assessment of a patient is invalid until one has all the information. Once he operated on the defendant and determined that the defendant had not sustained a gunshot wound, and he surgically treated the defendant’s injuries, what followed was merely a chart of the defendant’s post-operative care and treatment. No further “diagnosis” was given.
Dr. Cundiff confirmed on cross examination that at the time Wells was brought in with his injuries, he was not the attending physician, but was a surgical resident with full operating room privileges, and thus, he was the primary operative surgeon. He agreed that the defendant’s hospital records reflected that: “The patient has said I’ve been shot.” He also agreed that the admit diagnosis in Wells’ hospital records reflected gunshot wounds .to the abdomen, chest, and thigh.

Testimony of Don Hancock

Don Hancock, telephone supervisor for the Orleans Parish Sheriffs Office, detailed the recording of inmate telephone calls from jail, using the inmate’s unique folder number assigned to him/her at booking. He identified an exhibit as a CD of the defendant’s telephone calls from 17 through 29 March 2009. Mr. Hancock identified part of a conversation played for the jury from that CD. On | ¡«cross examination, he confirmed that the conversation was between an unidentified woman and the defendant, and that much of it had to do with each of them describing their physical anatomy. The entire conversation was played for the jury on cross examination.

Testimony of Amanda Masset

Amanda Masset testified that in 2005, she was employed as an Orleans Parish Assistant District Attorney, and she had worked on the defendant’s case from post-indictment in 2003 until the first part of 2007. She confirmed that she had occasion in April 2007 to observe in open court a tattoo on the back of the defendant’s shaved head that read “assassin.” Ms. Masset stated that her recollection was that on the previous occasions she had seen the defendant in court, he had hair. She confirmed that the defendant was incarcerated at the time, and agreed that it was not uncommon for inmates to tattoo one another.

*256
Additional Testimony of Don Hancock

Don Hancock, recalled as witness by the state, identified an exhibit as a CD of telephone calls that Wells made in jail from 30 March through 5 April 2009. He identified a portion of one of those telephone conversations from 2 April 2009; a portion of the conversation was played for the jury. The state referred back to a previously introduced exhibit, a CD of earlier jailhouse telephone calls of the defendant; a portion of a call/conversation from 28 March 2009 was played for the jury. Mr. Hancock also identified another exhibit as a CD of the defendant’s jailhouse telephone calls from 8 through 14 March 2009, and one conversation or a portion thereof from 11 March 2009. Transcripts of the defendant’s calls were presented and the CDs played for the jury. These calls were all made after his first trial that ended in a hung jury and mistrial.
|anIn the transcript of one of the telephone calls, Wells converses with an unknown female about beating the District Attorney’s Office, telling the female it was about “who got the winning argument, the best argument, the best story you gotta look at. That DA man can’t talk, well, you know. The DA, the DA was a mess, so who can’t give a story.” In the first of three telephone calls in a transcript, Wells is conversing with an unknown male and tells him: “Man, they can’t beat me. It’s over for them, it’s over for them. I put a brick in the window when I hit them with that, you heard me.”
In the second call, Wells says very little, usually agreeing/assenting to what the unknown male in that call says, by responding “Yeah” and “Uh-huh.” The following colloquy, obviously referring a number of times to the defendant’s claim that he acted in self-defense, is from the second call on:
BY MR. WEILLS:
Uh huh (affirmative response).
BY UNKNOWN MALE:
But it’s dirty and it’s awful but it’s the truth, the whole truth and nothing but the truth, so help a n — r god.
BY MR. WELLS:
It is what it is.
BY UNKNOWN MALE:
Now, that’s the f~k I’m talking about and there ain’t nothing else gonna be said, no other way on the phone or none of the other fellows on the tier or to nobody else. It ain’t gonna be said any other way, never, ever said.
BY MR. WELLS:
Yeah. They be right with me when we’re going against DA’s, going against the State. We ride with each other on that.
BY UNKNOWN MALE:
|S7Let me tell you something. That’s the only way it should ever be heard, that’s the only way that should ever been [sic] said and not nothing or no other thing should ever be said or heard being said by you except that it is the way it is.
BY MR. WELLS:
Yeah.
BY UNKNOWN MALE:
And that’s all anybody can ever go sit on the stand and say that you said.
BY MR. WELLS:
Un-huh (affirmative response).
BY UNKNOWN MALE:
You heard me?
BY MR. WELLS:
Yeah.
BY UNKNOWN MALE:
And that’s very important. Can’t have no mother f-king Cl come and sit down and say I was in the cell with him for six months and he said this and he said *257 that. No. I wouldn’t give a f-k if you was living a lie but we all know it’s the truth—
BY MR. WELLS:
Yeah.
BY UNKNOWN MALE:
—you have to stay with it all the time, never, never, never getting away from it ‘cause it is your life that you’re dealing with. First, we done already got to the point where you don’t have to worry about facing the electric chair—
BY MR. WELLS:
Yeah.
BY UNKNOWN MALE:
—no matter what the f-king DA say. And now we have to worry about them understanding that it was the truth, the whole truth and nothing but the truth so help a n — r god.
BY MR. WELLS:
laRUh-huh (affirmative response).
BY UNKNOWN MALE:
That it was self-defense and y’all need to let me up out of this bitch.
BY MR. WELLS:
Oh, real, huh.
BY UNKNOWN MALE:
You heard me?
BY MR. WELLS:
Yeah.
The third recorded conversation was with an unknown male, seemingly talking about going forward with his defense and being acquitted.
The longest transcript in evidence is of one conversation between Wells and an unknown male. In the conversation the defendant talks of his “little partner Kev,” who “had like four murders,” “got a hung jury,” and a couple of days before his scheduled retrial, his attorney told him the state dismissed the charges. Wells continued, saying that “murder trials” cost too much money, and the City did not have much money. He later revisited this thought, affirmatively saying the state did not want to go to trial, and he knew it did not. Wells then discussed in the conversation his first trial that ended in a hung jury, specifically stating how the prosecutor questioned Jose’s widow if she had ever known him “to do any kind of homosexual things.” The defendant subsequently said things like it was “my word against theirs,” obviously referring to his defense at his first trial and to which he would later testify in the present trial, that he was engaged in a homosexual relationship with the victim and that he killed the victim in self-defense. Wells said he “smashed them people,” obviously referring to his first trial that ended in a mistrial. The defendant bragged that he doubted the state would even want to retry | aflhim, saying it was really over. He later talked about the state losing every murder case they had tried “that week.”
The state rested its case in chief at the close of Mr. Hancock’s testimony.

THE DEFENDANT’S CASE

Testimony of Chanda Wells

Chanda Wells (“Chanda”), the defendant’s younger sister ■ and a teacher in KIPP New Orleans Schools, confirmed that she was recently separated from Flynn Forte, and was a good friend of the defendant’s former girlfriend, Jessica Con-diff, who lived around the corner from her. She testified that the defendant had been a truck driver who drove “big rigs” all around the country. The defendant would park his truck in front of where she lived in the Gentilly neighborhood, which was a two or three minute drive away the Vazquez Seafood Restaurant. Chanda testified that in late 2002 or early 2003, the defendant’s driver’s license was suspend *258 ed; he broke up with Ms. Condiff; and he moved.in with her, Mr. Forte, and her two children, sleeping in their den. She- confirmed that she believed that at some point the defendant had gotten his license back and had something lined up with an individual who owned his own trucks.
Chanda confirmed that on the evening before the defendant was arrested, she knew he was going out with Mr. Forte “and a couple of his friends” to the House of Blues. She went to sleep before they left her residence, but Jessica Condiff, ■ who had: been there, left before she, Chanda, went to sleep. She said that Wells was happy that night — “[s]ame old Tyrone.” The next day she got a call from her aunt, who reported that the hospital called to say the defendant had been shot and was in serious condition.

Testimony of Flynn Forte

UoFlynn Forte testified that he went out with Wells and a group of his (Mr. Forte’s) friends. The defendant had received news that he was about to start driving (commercial trucks) again, and he had -never been to the House of Blues, Mr. Forte said they left around 11:00 or 12:00 p.m. When asked whether they went anywhere after the House of Blues, Mr. Forte said he did not recall specifically, but that he .believed they “may have” hit a couple of clubs on Bourbon Street. He recalled that they headed home about 3:00 a.m., and he and Wells got home about 4:00 a.m. He said the defendant had been relaxed and in a good mood that night and was seemingly having fun. They stopped at a McDonald’s for some breakfast before going home. He said he went to sleep when they got home, and he confirmed that the last he saw of Wells that night/ morning was him going into the den and getting ready for bed. He said the next morning one of the defendant’s. aunts called, told them to turn on the news, and to check if Wells was in the den. They later went to the hospital. Mr. Forte acknowledged that a doctor informed him that the defendant had been stabbed and shot. He said he went to the police station, and he “believed” he gave a statement there. He was never contacted again by NOPD. Mr. Forte replied in the negative when asked whether he knew anything of the defendant’s “relationship” with the victim before the first trial. He also replied in the negative when asked whether he had known of Wells’ “behavior and incidents in the French Quarter earlier in his life.”

Testimony of Kim Davidson

Kim Davidson stated that he did not know Wells. He did know Jose with whom he had attended John' F. Kennedy High School. Mr. Davidson had worked at the Vazquez Seafood Restaurant for two months in what he recalled must have been 1994 or 1995. (He worked the cash register taking orders, and Jose was his |41boss.) He confirmed that he knew Mr. Vazquez well. Mr. Davidson further confirmed that the week before that day of trial he telephoned attorney Robert Jenkins for the purpose of supplying- some information he believed concerned the case. He also confirmed that as a result of that conversation, he met the following day with the two defense counsel and the two state’s attorneys in the case. After revealing some information to the attorneys, he was handed a subpoena to testify.
Mr. Davidson replied in the negative when asked whether Jose made what he (Mr. Davidson) viewed as a sexual advance toward him. He did say Jose made what he would say was a rude, offensive remark. He testified that one morning “we” (himself and other employees) were wrapping sets of eating utensils in napkins. Mr. Davidson noted that he was tall and so had spread his legs apart to (lower his torso and) bring his hands down closer to the *259 table so as to be in a more comfortable task position. He stated that Jose came out of his office and was joking around with the workers when he asked Mr. Davidson why his legs were spread apart like that, saying it looked like he was about to spread his butt cheeks. Mr. Davidson stated that his reaction was to bring his feet together, turn around, and look at Jose, who laughed and went on to the next subject. Mr. Davidson replied in the negative when asked if he ever said anything to Jose about the remark. When asked why he had not, Mr. Davidson replied that it was because he was embarrassed and Jose was his boss.
Mr. Davidson stated that he was offended by Jose’s remark, and when asked why, he said it was because “it was a homosexual remark and I’m not homosexual.” When asked why he had come forward with the information, Mr. Davidson prefaced his answer by stating that Jose was “cool” (in a positive way) to him, and he had the highest respect for his family. He then explained that he had 142heard Jose had been murdered, and that after the first trial and news media reports of the homosexual accusations, he kept thinking about his incident. He said he would have felt uncomfortable had he not mentioned the incident to the attorneys, in case it was important. Mr. Davidson denied that he ever felt any animosity toward Jose or toward Mr. Vazquez. He stated that he had the deepest respect for “him” and for Mr. Vazquez. He said it bothered him to come forward with the information, but he had a conflict in his mind and thought doing so was the best way to alleviate it.
Mr. Davidson confirmed on cross examination that when he heard the accusation from the first trial, it “blew” him “away” because he had never heard anything like that about Jose. He confirmed that the victim never exhibited anything suggesting he was involved in any type of homosexual activity, and he could not believe it because “it wasn’t Jose.” Mr. Davidson stated that he- graduated from high school in 1984; that he had known Jose in high school; and that the victim had no type of “homosexual dealing” then (as phrased by the prosecutor cross-examining him). He never knew Jose to be involved in any type of homosexual activity while he worked at the restaurant. He confirmed that Jose was a good guy and would joke around with anyone, but that on that morning, his feelings were hurt when he was on the receiving end of that joking remark. Mr. Davidson denied that he came forward becausé he wanted to get his name in the newspaper or be on television. Hé said that no one in the restaurant laughed at the remark, only Jose himself. Mr. Davidson stated that the remark was nothing that would’ have caused him to leave the restaurant/quit his job immediately, but he also commented that he had to make a living. He denied being fired, and explained that he left the restaurant because the pay-was not good enough for the work he was Ladoing, noting that when he quit, Jose commented to another employee how he could not keep anyone employed at the cash register.

Testimony of Kenneth Krowl

Kenneth Krowl, a Louisiana Department of Corrections' trustee approximately six years into a thirty-year séntence for manslaughter, testified that he had two other prior convictions, one for possession of a stolen vehicle and one for possession of methamphetamine. He was a statewide trustee, meaning he could travel all over Louisiana with a State Police Trooper. Mr. Krowl testified that he was housed in Orleans Parish Prison (“OPP”) ■ from 2003 until being evacuated after Hurricane Katrina. He was returned to OPP when it reopened in late 2005 or the beginning of 2006. Mr, Krowl confirmed that he knew *260 Wells, having met him in OPP around the end of 2004 or the beginning of 2005. He said they were friendly towards each other but were not really friends. Mr. Krowl was a tattoo artist, something he learned in jail. He replied in the affirmative when asked whether he had tattooed the defendant. While he never testified on direct examination as to what he tattooed on Wells or where on the defendant’s body he did so, Mr. Krowl later confirmed on cross examination that he had tattooed “assassin” on the back of the defendant’s head. Mr. Krowl explained that some inmates want something that will give them a little prestige, and he noted that the defendant had considered getting tattooed with “Notorious,” a reference to a rapper. Mr. Krowl replied in the negative when asked whether Wells ever “talked about his charge,” stating that the only thing he knew about it was what he saw on the news or what he heard others talk about concerning what they thought might have happened. When asked whether it was common for people (meaning inmates) to talk about their cases or charges, Mr. Krowl replied in the negative. He | ¿¿confirmed that inmates try to use things they might learn about another inmate’s case to their advantage all the time, stating that “if I can get something better out [sic] the deal for saying something about somebody, I’m going to do it.”
Mr. Krowl was asked on cross examination what he was getting out of “the deal” for testifying on behalf of Wells, followed by a more to-the-point question: ‘Why are you here?” Mr. Krowl replied that he was testifying because someone asked him to do so; that he was not getting anything out of it; and that the only thing he was doing was what was right, for once in his life. He replied in the negative when asked whether he knew the victim. He confirmed on redirect examination that the first time he testified in the defendant’s case, he was in court without handcuffs or chains with a single State Trooper. He further confirmed that the only reason he was in handcuffs and chains at his present court appearance was that he had been staying overnight in custody locally since defense counsel first met him several days previously.

Testimony of Ameka Cheetum and Dr. Aruni Akundi

The trial court then had its law clerk read transcripts from two witnesses, Dr. Aruni Akundi and Ameka Cheetum, who testified at the defendant’s first trial, but were unavailable to testify that day in the second trial. Following a reading of their testimony, defense counsel introduced copies of the respective transcripts of that previous testimony as evidence.[2]
14SPr. Aruni Akundi, called as witness by the defense at defendant’s first trial, testified that in July 2003 she was a fourth- *261 year senior resident in emergency medicine at LSU Charity Hospital when Wells was brought in for treatment. Dr. Akundi confirmed on cross examination that an exhibit prepared either immediately in post-op recovery or in the surgical intensive care unit reflected that the defendant had sustained a gunshot wound to the abdomen and a gunshot wound to the thigh. She identified an exhibit as a document containing handwriting that reflected “per EMS” “gunshot wounds.” Dr. Akundi admitted that she had no independent recollection of that day. She confirmed that an exhibit was the trauma flow sheet, reflecting herself as the resident. She confirmed that the information on the exhibit would have been communicated (called out) to a nurse in the emergency room to write down. The doctor agreed that there would be no reason to write down anything on the document but that which she believed she saw in the emergency room that day, and which reflected gunshot wounds to the thigh and the area between the defendant’s chest and abdomen. Dr. Akundi confirmed that the best evidence of what wounds the patient had sustained would be a combination of the charts, having no reason to doubt the accuracy of the documents.
Dr. Akundi confirmed on cross examination that, as the patient sits there, she did not really care what caused the penetrating wound. She agreed that there could be errors on, for example, the trauma flow sheet. She confirmed that her primary goal in the emergency room is the survival of the patient, and she might never even look at the trauma flow sheet. She testified that “our” job, presumably meaning |4fieither herself or the emergency room trauma team as a whole, was not to determine whether the wound was a gunshot wound or a stab wound, but to identify the wounds and determine which are life-threatening and which can be addressed later. She agreed that if the trauma surgeon had testified that the wounds to the chest and leg were more consistent with stab wounds, she would not contradict that. Dr. Akundi confirmed that she did not have any follow-up with Wells, and she stated she probably had him for “maybe ten minutes at the most.” ■
Ameka Cheatham, also called as a witness on behalf of the defense at Wells’ first trial, testified then that she was then a graduating senior in college. She worked for the Vazquez Seafood Restaurant for two years when she was a junior and senior in high school and worked there at the time the victim was murdered and for approximately three months afterward. She had never seen Wells, did not know anyone in his family, and knew nothing about the killing. Ms. Cheatham confirmed on cross examination that Mr. Vazquez and the victim were good bosses, describing the deceased as “a very good boss” who, she agreed, took care of his employees. She was devastated about the murder, unable to believe someone would do that to Jose. Ms. Cheatham testified on redirect examination that she had spoken to Mr. Vazquez during her time working in the restaurant, and he spoke to her in English. She confirmed on recross examination that Mr. Vazquez spoke broken English.
Testimony of Cameron Gamble[3]

J^Testimony of Tyrone Wells

Tyrone Wells, the defendant, testified that he had been in custody for six and *262 one-half years. -He was seventeen when he dropped out of school in the ninth grade, went to Atlanta to live with an uncle for approximately nine months, and worked in two fast food restaurants before returning to New Orleans. In 1993, he returned to Atlanta, driving a stolen car with a friend, with a gun in the car. Wells said he did not steal the car, but got it from, one of his “podnahs”/friends who had stolen it and was about to dump it. The defendant was arrested in Atlanta, pleaded guilty, and received a sentence of community service as a first offender. He remained in Atlanta, began selling crack cocaine, and was arrested on a burglary charge for being in a vehicle with goods stolen by someone who had attempted to trade the goods to him for crack. He pleaded something in the nature of nolo contendere and received a light jail sentence. When he got out, he returned to selling drugs and was arrested in a vehicle with a few “podnahs,” all of whom had guns. He was convicted on a gun charge and went back to jail, being released in 1997.
14SThe defendant said he then moved back to New Orleans to live with his mother and began working as a busboy at Broussard’s, a French Quarter restaurant. He said he and his “podnahs” would change clothes at the restaurant and go out to bars after work in the French Quarter. He said he kept getting solicited by persons seeking to purchase cocaine and eventually left his job and began selling cocaine for a living. He confirmed that he ended up getting arrested “about ten times” in 1997 and 1998 in the French Quarter for possession of cocaine, soliciting prostitution, lewd conduct, et cetera. He said he was heterosexual, but he would come into contact with gay men when he was selling drugs who would solicit him to let them orally copulate him. He said he had no problem with that. He said he was arrested one time while in the act. Wells said he had engaged in that behavior in 1987 when he was younger and tap dancing in the “gay section” of Bourbon Street. He said he and his friends would make *263 more money “letting them punks suck and suck” than tap dancing. He denied ever engaging in any other homosexual activity. He admitted that he was ashamed when he first began submitting to oral sex, but he then just started looking at it as a money thing.
Wells stated that in his thirties he got tired of hustling and went to school to get a commercial driver’s license. He began driving routes in the South and East Coast, driving for two weeks and living in his truck, with three days off in between runs. He confirmed that he got paid “pretty good.” He identified five exhibits as photographs taken in Atlanta of him, his truck, and/or “Lajuana,” whom he did not identify further. He would customarily wear a bandanna on his head and. another on one wrist; he was. wearing two such bandannas when he went out the night before Jose was killed. He admitted that one was found on his person at the hospital and one at the scene of the killing. Wells stated that his former girlfriend, |49Ms. Condiff, and her son sometimes accompanied him on trucking trips. He lost his trucking job in late 2002 or early 2003, around the time.he ended his relationship with Ms. Condiff, at which tíme he moved in with, his sister and Mr. Forte, while Ms. Condiff moved around, the corner to live with her mother. He said he began working temporary jobs and was babysitting his sister’s children.
The defendant detailed how he first met the victim one day in early June 2003. It was around noon, and he was on the Broad Street bus on his way to his sister’s home when he decided to get off the bus and walk to his mother’s home in the Seventh Ward to borrow money from her. His mother was not home, so he re-boarded the Broad Street bus (he had a bus pass), intending to go to his aunt’s home to borrow money. When he exited the bus at Franklin Avenue and Broad Street, the victim was stopped in a F-150 truck at a red traffic signal light. He said he and the victim made “eye contact,” and the victim “eventually flagged” him to come over. Wells testified that the victim asked him where he was going and whether he needed a lift. He testified that he got into the victim’s truck and, as they drove, the victim asked him questions — his name, what kind. of work he did, whether he had a girlfriend, et cetera. He said he was telling the victim that he used to drive 18-wheel-ers when the victim interrupted him to point out the Vazquez Seafood Restaurant as they were driving past, telling the defendant that* he and his father owned it. Wells testified that he had never been inside the restaurant but had been there once to pick up his ex-girlfriend’s (Ms. Condiff) sister, who was working there. He estimated this had been months before he met the victim. He stated that when the victim stopped to let him out at Robert E. Lee Boulevard and Franklin Avenue, the victim touched him on the leg and asked him if he would like to earn a, little extra money until he got a trucking job. He replied hnin the affirmative, thinking he was going to be hired to work in the restaurant. Instead, he stated that the victim propositioned him, offering to pay him $100 for one (unspecified) sexual favor. Wells countered, that for $200, it was a deal.
Wells testified that the victim agreed, and the two set up a rendezvous for 11:00 p.m. that night at that same intersection. He drove his ex-girlfriend’s car to the location, intending to let the victim orally copulate him, as he had let gay males do to him in the French Quarter. The victim arrived, and he followed him in Ms. Con-diff s car to a location under what he said was the “Haynes bridge,” where he entered the victim’s car. He said he knew the victim wanted to “have sex,” presumably *264 meaning anal intercourse, but he said something urgent had come up, and so Wells asked if he could at least orally copulate him. Wells said the victim paid him $200 for this five or ten-minute interlude, and they made plans to meet up the following week under the Haynes bridge at 11:00 p.m. One week later, the two met again. Wells testified that the victim wanted to have intercourse with him, but he refused, instead permitting the victim to orally copulate him again for $200 and promising intercourse in the future. The defendant agreed to meet the victim a third time. When asked why he agreed to meet the victim if he did not want to do the sexual act the victim wanted to do with him, he explained that he was just going to get as much money out of the victim as he could “before, you know, he finally got tired and said — you know, it was just a hustle.”
Wells testified that he met a third time the following week at the same location. He said the victim wanted to go to a hotel room, but he put him off, and he let the victim — whom the defendant said he could see was really “pissed” — orally copulate him. He said the victim could not find his wallet, gave him $30 he had in his pants pocket, and told the defendant to come by there the following |B1 night and he would give him the rest. Wells did not show up the next night, so the following day the defendant drove to the restaurant, catching the victim as he was leaving in his truck. When Wells asked for his money, the victim said he would have to get it out of the safe, and the two agreed to meet at 11:00 p.m. that night (apparently at the restaurant). Wells said the victim told him that the next time he came by not to park in the restaurant parking lot, but to park at the gas- station on the side street or someplace else. The defendant said he returned to the restaurant that night but did not see the victim’s truck in the parking lot, nor did he see anyone inside; he noticed a sign that said the restaurant closed at 10:00 p.m. He felt the defendant was trying to dodge him. He said he telephoned the restaurant and must have gotten restaurant employees three or four times, so he just pushed it to the back of his mind.
The defendant was living with his sister during this period, but was still friendly with his then ex-girlfriend, Ms. Condiff, when he accompanied her to purchase a gun. She decided she wanted a gun for her home because (a) she had been burglarized, and (b) another time she was at a stop sign and some youths tried to open her door, but she was able to speed away. Wells said Ms. Condiff picked out the gun at the pawn shop.
He saw the victim again on the afternoon/evening of 10 July 2003 while driving in Ms. Condiffs car from the Gentilly Woods Mall to his sister’s residence, which took him to Filmore Avenue near the Vazquez Seafood Restaurant. He said he spied the 'victim sitting in his truck with his head down like he was reading and writing. Wells double backed, parked, and exited the car. He said that when the victim saw him, the victim began saying what the “F” are you doing here, didn’t I tell you not to come over here, asking the defendant what he l^was doing on his property. Wells told the victim that if he did not pay him the money he owed him, he was going to “blackmail” him. The defendant told' the victim that he would go in and tell the victim’s family, his customers, his employees, everybody, that he was an “undercover faggot or whatever.” Wells indicated he said that loudly, whereupon the victim began “shushing” him and looking around as of if he was expecting someone to come out of the rear of the restaurant. The defendant testified that the victim then told him to come to the *265 restaurant the next morning around 5:00 a.m., at which time he would pay him.
Wells confirmed that by that time he had lined up some work, stating that he “was supposed to get a job with Walter like a few days down the line.” He said that Walter owned two trucks .and he wanted the defendant to drive one between New Orleans and several southern states. Wells identified an exhibit as his Louisiana commercial driver’s license with two staple holes in it, with an issue date of 7 September 2001 and an expiration date of 10 March 2005. He stated that it was valid on 11 July 2003.
The defendant testified that he went out on the night of 10 July 2003 with Mr. Forte and several others, including “Wayne,” “Leonard,” and two others. They went to the House of Blues, “Utopia,” and a club on St. Claude Avenue. He said he only had two or three drinks, noting that he was driving. He said they stayed out until 4:00 a.m. or so, stopping at a McDonald’s before going-home. He later said he and Mr. Forte got back to his sister’s home between 4:00 and 4:30 a.m. He said everyone went inside McDonald’s save him. When later asked where the others ate their food, he sáid he believed it was in the McDonald’s. He admitted that he had the gun Jessica Condiff had purchased in the glove compartment of the car. He said he did not realize it was there until he opened the | faglove compartment to get a cell phone charger. He closed the glove compartment with the gun inside. However, he said that, when the others were inside McDonald’s, he opened the glove compartment, got the gun, put it in his waistband, and .smoked some marijuana. He replied in the. negative when asked whether he had taken the gun into any of the clubs.
Wells confirmed that he left his sister’s home again at 5:00 a.m. and drove to the Vazquez Seafood Restaurant, which he estimated was three minutes away. He confirmed that he parked on Venus Street, behind the restaurant, because the victim had told him he did not want him on his property. When asked if he had the gun on his person, defendant replied: “Yeah. I didn’t second guess taking it off.” When queried by his counsel as to why he left it on, he stated: “Well, I was going to Jose’s, you know, and five in the morning was still dark, you know. I knew I was going to be walking, so — .” He said the victim was sitting in his truck at the back gate. The defendant said the victim hopped out of his vehicle, and they had “like a little small altercation.” When asked if it was an argument or a friendly discussion, Wells admitted that on his “end,” it was an argument. He said he felt “kind of played,” the way the victim had been dodging him. When asked what the victim’s reaction was, he said he (the victim) was “playing it like it was cool,” saying he had the money.
Wells stated that a car with its headlights on pulled up as he and the victim talked. He said he thought it was a restaurant employee, while the victim asked him if the car was for him. The defendant stated that the car pulled in and backed out, as if the driver had made a wrong turn. He said the victim pulled out his wallet and counted out $127. He told the defendant to come inside so he could get him $50 more. Wells said the victim removed the padlock and chain from the | Rtfence gate; he entered first, then the victim, locking the gate behind him. He said he unlocked the rear door, again letting the defendant enter first. Wells stated that after entering the restaurant, the victim took the lead. They went to the. office, and he stood in the doorway while the victim bent down and opened, a file cabinet.
The defendant testified that when the victim stood back up, he asked him how *266 was he to know the defendant would not just take the money and then blackmail him anyway. Wells testified that, he told the victim that he had just been playing with him and that he would not have blackmailed him. The defendant said the victim was close to him, and he punched the defendant in his face, then grabbed him and slammed him against the wall, against the desk, and onto the floor. Wells testified that he was five feet three inches tall and weighed 130-something pounds back then. He stated that the gun he was carrying fell from his waistband, and the victim picked it up and shot him in his stomach as he (the defendant) was just inside the office door. He said the victim shot him a second time, in his right thigh, whereupon he said he staggered out of the office and fell on the ground. He asserted the victim came out and tried to pull the trigger again, but the gun jammed, so he pulled the magazine out of the gun, threw it, and “tried to shoot through the gun.”
Wells said it looked like the victim knew what he was doing with the gun. He said the next thing he knew, the victim came towards him with a knife. He said he tried to kick the victim, and the victim stabbed him under the leg, apparently under the knee, in the same leg in which he allegedly had been shot. He said that when he kicked the victim, the victim stepped back and stabbed him “again” in the thigh, near where he had been shot. He said when the victim stabbed him the second time, he kicked the victim with both legs, causing the victim to fall against lasóme dining tables. He said the victim came at him again and stabbed him in the stomach. He said he balled up, and the victim came at him and caught his face with the knife blade. Wells stated that he grabbed the knife blade and cut his hand. He was able to get the knife away from the victim. Wells displayed his wounds to the jury, including one on his back that he claimed was from a bullet exiting his body.
The defendant testified that when the victim came at him with the knife the last time, he was scared that he was going to die. He said that at that point, he believed the victim was trying to kill him, saying he had no option but to grab the knife blade. He confirmed that the knife came out of the victim’s hands, and he was able to hit the victim on the leg with the knife, although he did not have a full grip on the knife. He said he got half up, and the victim grabbed him by the neck and choked him. He confirmed that the victim had only one stab wound to the leg at that point. He said he had the knife closer to the handle at this point, and he stabbed the victim twice in the side to get him off of him. He said the victim fell back, but got back up and put the defendant in a bear hug. Wells said he then hit the defendant in the back with the knife, “like on the side.” He said this was the last time he stabbed the victim, who fell onto the floor and lay there looking at him and breathing hard. Wells said: “I seen [sic] he wasn’t going to get up. He wasn’t dead at that point with eyes out, but I seen [sic] he wasn’t going to get up.”
Wells stated that his whole body was bloody. He said he picked up the gun and attempted to leave through the rear door through which he and the victim had entered. He admitted that his blood was on the swinging doors and the rear door. He stated that the door did not have a handle, and he could not get out. He said he returned to the front of the restaurant and hit the ground. Wells denied that the 1 fiñblack backpack found in the restaurant was his, saying the first time he saw it was at his first trial. He denied ever seeing the hat that was found inside the backpack. He confirmed that one set of keys found at the scene was his. He stated that he remem *267 bered Mr. Vazquez standing over him and yelling that he had killed his son. He did not recall telling Mr. Vazquez to kill him, although he did not dispute that he did so. He did not recall making a statement about males trying to rob him then leaving through the rear door. Nor did he remember making a statement in the ambulance that he could not believe that he had done what he had done.
Wells did not remember telling a hospital admissions nurse that he said he had been shot. He said the first thing he could remember about the hospital was being handcuffed to the bed and having all kinds of tubes in him. He indicated that he remembered being in the MOU of OPP. He denied that he knew Mr. Ricks at that time, but said he knew him now. He subsequently confirmed that he remembered talking to Mr. Ricks in the MOU. But he denied ever confessing to Mr. Ricks about killing the victim or telling him any of the things that Mr. Ricks testified that he said. Wells did not recall seeing anything on the television news on 17 or 18 July 2003 about the Vazquez Seafood Restaurant killing. He testified that he got his “assassin” tattoo in July 2004; that in choosing that word other inmates had suggested thinking that it would look better than the tattoo he had been thinking of getting: “Notorious B.I.G.” He said the tattoo had nothing to do with his killing of the victim, for it was all about the image on the prison tier where he was being held, with inmates charged with serious crimes like murder and rape.
The defendant discussed his jail telephone calls introduced in evidence and played for the jury. He stated that one of the calls was made on the day after his first trial had ended in a hung jury. He said when he referred in one call to his 157“podnah” Kev having four murder charges dropped, he was talking about a fellow inmate, He testified that when he talked in one call about “killing them with that story,” he was referring to finally being able to get his story (his testimony at his first trial) out there after six years of the state and the media referring to him going to the restaurant to rob it. Wells said he was glad to finally' get his story out. When he was asked about the 28 March 2009 jail recording during which he talked about who it was “who had the winning argument,” he said he was talking to a female who stated that her daughter, who he indicated had studied paralegal work, had said he was screwed. His reply to that was that the side which had the best argument (best story) would prevail. Wells confirmed that the final call was to his uncle, on 2 April 2009, a couple of weeks after the first trial. His uncle was a married “Christian man” and so he (the uncle) referred to the homosexual aspect of the défense as dirty and awful, but it was the truth and had to be told. He stated that the unsaid but underlying issue when his uncle was talking about his never, ever getting away from the homosexual and self-defense aspect of his story was that he (the defendant) initially did not want that homosexual evidence to come out because it was embarrassing. He said he initially wanted his attorneys to get around that issue without him having to discuss it on the witness stand.
Wells confirmed that he knew the calls were being recorded. He replied in the affirmative when- asked whether he could accept every word on those telephone recordings, He denied going to the restaurant on the morning of 11 July 2003 to rob the victim. He said he went there to collect the money the victim owed him. He said he could have easily shot the victim, taken the money out of the “safe,” and left. He said he never even pulled the gun out of his waistband. He stabbed the victim to get him to back off and stop attacking him. He *268 confirmed he did it to l^save his own life. He said he felt sorry for having killed the victim, but he said the victim was trying to kill him, and he had no choice but to do what he did.
Wells was questioned on cross examination as to why, in the jailhouse telephone conversation with his uncle, his uncle said to him: “Let’s make it inore dramatic next time?” He said he had no idea why his uncle said that, noting that his uncle was not even at the first trial but was in Atlanta. He said that his uncle told him not to say anything over the telephone or to other inmates, saying that his uncle knew about the last trial and that the state had put a “so-called witness against me,” an apparent reference to Mr. Ricks. When confronted with his seemingly being happy during one of his jailhouse phone calls, the defendant said that of course he was happy. He explained that he had been in jail for six years trying to get his story out in the face of the state and the media reporting that he had gone to rob the restaurant and that he killed the victim during a robbery attempt. Wells said his “story,” as he referred to his version of the events in his jailhouse telephone calls, was the truth as to what happened.
The defendant testified that he had the gun on his person when he went to the restaurant on 11 July 2003 because he felt safer with it at 5:00 a.m. in the dark when he had to walk from his ex-girlfriend's car to the restaurant. He noted that people pull up, jump out, and rob and kill people at will in New Orleans. He said his carrying the gun had nothing to do with the victim. He conceded that as a convicted felon at the time, he could not be in possession of a gun. He denied that his ex-girlfriend, Ms. Condiff, purchased the gun for him.- Wells said his “assassin” tattoo was just a macho-type thing, to back people off, noting that he was small in stature. He denied that Mr. Ricks put him on the phone with an attorney. He said that he did not say he and Mr. Ricks had not talked, admitting | fi9they had a “little” conversation, only that it was not about lawyers. He denied telling Mr. Ricks that he had an inside source at the restaurant. He again denied having ever been inside the restaurant before 11 July 2003.

Testimony of Nizan Peerwani

Dr. Nizan Peerwani was qualified by stipulation as an expert in the field of anatomic and clinical pathology and forensic pathology. Dr. Peerwani testified that she had been and currently was the chief medical examiner for the Texas counties of Tarrant, Parker, and Denton, with her office located in Fort Worth, Tarrant County, Texas. She confirmed that she testified at the defendant’s first trial.
Dr. Peerwani was asked about the expertise of a trauma surgeon as compared to that of a forensic pathologist. She said that a trauma surgeon is trained to save lives and understands the human body from the perspective of hemorrhage, injuries, and trauma; he can repair those damages. She said a forensic pathologist, on the other hand, is trained to examine the trauma and give predicted value as to what instrument produced that injury.
Dr. Peerwani stated that her examination of the defendant’s medical records and her examination of the defendant’s scars led her to conclude that he sustained a gunshot to the abdomen. She noted “multiple notations in the medical charts saying” that Wells sustained a gunshot wound in the epigastric area, which is right below the sternum, and an exit wound — the only exception being notations by trauma surgeon Dr. Cundiff. She said the gunshot (entry) wound location was consistent with where the defendant said he was shot. Dr. Peerwani noted that Dr. Cundiff reported that he explored the defendant’s dia *269 phragm and found a large collection of blood within the chest on the right side. She said the radiologist |finreport stated that the upper lobe of the right lung was collapsed (something to which Dr. Cundiff had testified). Even as late as 14 July 2003, the radiologist noted there was subcutaneous (soft tissue) emphysema present, persistent in the left chest. She said this finding implied there was air in the soft tissues of the chest wall that can be seen by x-rays. Dr. Peerwani testified that “[i]t is not usual at all to find soft tissue emphysema in a stab wound.”
Dr. Peerwani further elaborated that with a stab wound, one can have a collapsed lung because air gushes into the chest area, but the air does not escape and travel into the soft tissues. She stated that a velocity sufficient to push the air out and into the soft tissues is usually seen “in gunshot wound, not exclusively, but what is far more common is gunshot wound.” She noted that Dr. Cundiff offered no opinion as to how blood got into the right chest cavity. Dr. Peerwani said Wells’ medical records were consistent with a gunshot wound that traversed from the right abdominal area, lacerating the epi-gastric blood vessel, and nicking the liver. She agreed with Dr. Cundiff that there was no injury to the abdominal cavity. When asked by defense counsel why the blood pooled in the right chest could not have come from a knife wound as opposed to a gunshot wound, Dr. Peerwani replied that Dr. Cundiff did not describe that at all, noting the absence of a description that the knife wound had gone upward. Dr. Peerwani was asked about two scars on the defendant’s back. She testified that one was consistent with a wound from a knife, noting that the defendant did have a stab wound of the left upper back. As to the “other” back scar, Dr. Peerwani testified that it was her conclusion, “based on all the things that cannot really be explained, that the other wound was really an exit gunshot wound made by the bullet that hit the | ri epigastrium.” However, she said the other possibility was that the defendant was stabbed twice in the back, and this was certainly something one had to consider.
She also testified concerning the knife wounds inflicted on the victim. She dismissed the one to the knee as relatively insignificant. She said she had listened to the defendant’s testimony about stabbing the victim, and the other four stab wounds inflicted on the deceased were consistent with his claim that he first stabbed the victim in the leg (wound “C” — the letter designations as per coroner Dr. Traylor), then in the flank (wound “D”), and eventually twice in the back side (wounds “B” and “A”). She speculated that once stab wound “A” was inflicted, the deceased would have been “rather rapidly decom-pensated,” and thus, it was reasonable to speculate that wound “A” was the last stab wound sustained by the victim. She referred to wounds “B” and “A” as “cluster” wounds inflicted in rapid succession.
Dr. Peerwani admitted on cross examination that a patient’s plan of care would more than likely , be determined by the trauma surgeon. She agreed that this would be based on the trauma surgeon’s findings upon opening up the patient and actually seeing what was wrong. Sbe confirmed that she did none of that, but had simply reviewed the defendant’s medical records. Dr. Peerwani was- questioned whether a trauma surgeon, who had his hands inside of the deceased, would have firsthand knowledge of what his injuries were. She replied that she was talking about “recognition of trauma,” and she stated in so many words that a .surgeon really- cannot look at the wound and do a better job than a pathologist can.
*270 | faWhen asked on redirect examination by defense counsel, she agreed with coroner/pathologist Dr. Traylor that a forensic pathologist is in a far better position to analyze the wound and make a definitive finding than is a surgeon.[4]
The defense then rested its case.

THE STATE’S REBUTTAL CASE

Testimony of Karen Mosteiro

Karen Mosteiro testified that she was employed by the Vazquez Seafood Restaurant (apparently as a cashier) from approximately August 1993 to August 1998, and then again from early 2000 to July 2003. She identified an exhibit as appearing to be an employee list from the restaurant, saying she recognized the names. She confirmed that her name was on the second page. She knew Kim Davis [sic] (Davidson) as a customer, but not as an employee. She was not sure how long she had known Mr. Davidson to be a customer of the restaurant, -but she replied in the negative when asked whether she had any recollection of him working there. She was unaware of any incident that allegedly occurred between Mr. Davidson and the victim “other than normal transactions.” Ms. Mosteiro identified two exhibits as photographs of the victim’s dull red, four-door truck, for she had seen it often. She confirmed that he was driving that truck in July 2003.
Ms. Mosteiro testified on cross examination that from 1993 to approximately 1996, she worked at the restaurant part-time" at night, Monday through Friday, from 4:00 p.m. to 9:00 p.m. She said from 1996 to 1998, she worked full-time. She [(¡(¡confirmed that there was a shift at the restaurant that began in the morning. When asked whether she and someone working in the morning would not cross paths, Ms. Mosteiro replied “[p]robably not,” but she noted that there was an employee schedule on the wall. She would have known daytime cashiers because they and the part-time night cashiers would meet at 4:00 p.m. when the day-shift cashiers closed out them registers. She confirmed that, as a practical matter, if an individual worked there other than as a cashier, she would not know if they worked there or not if his/her name was not on the schedule. However, she said she recalled Mr. Davidson because he often phoned in orders, that he would then pick up, noting that they often misspelled his name, and he would correct them. If Mr. Davidson had worked several months in the mornings when she worked in the evenings, she would not necessarily have known that. Ms. Mosteiro stated, that she would have known because employees received a discount at the restaurant, so she assumed he would have told her this in 'order to get his discount if he had been an" employee. When asked whether she remembered Mr. Davidson being fired, Ms. Mosteiro replied; “I don’t remember him being an employee, so no.”

Testimony of Tina Fly

Tina Fly testified that she was the manager of a McDonald’s restaurant on Louisa Street and Old Gentilly Boulevard. She said she had worked at that McDonald’s location since 1982, remaining at that Ioca *271 tion after it was rebuilt in 2001 to face Old Gentilly Blvd. Ms. Fly stated that the doors to that McDonald’s opened at 6:00 a.m. and closed at 10:00 p.m., but the drive-thru was open twenty-four hours a day. She confirmed that those same hours were in effect in July 2003, stating on cross examination that they became effective in 2001. She said the restaurant began serving breakfast at' 4:00 a.m., but one could only get breakfast |R4via the drive-thru until the doors opened at 6:00 a.m. She said on redirect examination that one could not order breakfast at 3:30 a.m, or any time earlier than 4:00 aim.
Such concluded the presentation of the evidence in the case.
ERRORS PATENT
A review of the record for errors patent reveals none.
ASSIGNMENTS OF ERROR NOS. 15 AND 16
When a defendant presents issues of alleged trial errors as well as a claim that the evidence presented at trial is insufficient to sustain his conviction under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the sufficiency of the evidence claim is addressed first by the court. State v. Marcantel, 00-1629 (La. 4/3/02), 815 So.2d 50, 55; State v. Gibson, 15-0682 (La.App. 4 Cir. 1/27/16), 186 So.3d 772, 779.
This court has set forth many times the well-settled standard of review for sufficiency of the evidence. In State v. Watkins, 13-1248, pp. 13-14 (La.App. 4 Cir. 8/6/14), 146 So.3d 294, 303, we said:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4[th] Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most | ^favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary-to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
In addition, when circumstantial evidence foms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements .must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary, guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
*272 Id., quoting State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111.
Generally, the testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. Watkins, 13-1248, p. 14, 146 So.3d at 303, citing State v. Wells, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A fact finder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. Watkins, supra.
Wells claims he killed the victim in self-defense. A homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.” La. R.S. 14:20 A(l). However, “[a] person who is the aggressor or who brings on a difficulty cannot | nriclaim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.” La. R.S. 14:21.
In a homicide case in which a defendant asserts that he acted in self-defense, the state has the burden of establishing beyond a reasonable doubt that that defendant did not act in self-defense. State v. Taylor, 03—1834, p. 7 (La. 5/25/04), 875 So.2d 58, 63; State v. Miller, 14-0406, pp. 19-20 (La.App. 4 Cir. 2/25/15), 160 So.3d 1069, 1082-83.
The due process standard of review under Jackson v. Virginia does not sanction juror speculation if the evidence is such that a reasonable fact finder must have a reasonable doubt. State v. Higgins, 03-1980, pp. 17-18 (La. 4/1/05), 898 So.2d 1219, 1232; State v. Gordon, 13-0495, p. 18 (La.App. 4 Cir. 7/16/14), 146 So.3d 758, 770.
Wells was convicted of the second degree murder of Jose Vazquez Jr., in violation of La. R.S. 14:30.1, which provides, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, forcible or second degree rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
Wells. admitted that on the day of the killing, 11 July 2003, he went to the Vazquez Seafood Restaurant armed with a handgun that had been purchased by his | fl7ex-girlfriend four days earlier in his presence. The defendant, a convicted felon who admitted that he could not lawfully possess a firearm, claimed he needed it for self-protection (from possible robbers/assailants) on the morning of the killing because it was approximately 5:00 a.m., and he had to walk a short distance in the dark to the restaurant. Wells claimed the victim had solicited him for prostitution in the preceding week or so, and he had permitted the deceased to orally copulate him in exchange for $200 for each of three assignations. The defendant claimed he and the victim had arranged to meet at the restaurant that morning at 5:00 a.m. so that the victim could pay him the balance of the $200 the victim owed him for the last sex *273 act he let the victim perform on him. Wells claimed the victim attacked him once inside the restaurant and his (the defendant’s) gun fell from his waistband where it was concealed, whereupon the victim picked it up and shot him twice, once in the abdomen/chest and once in his thigh. The defendant claimed the gun jammed, and the victim then procured a knife and stabbed him before he (the defendant) was able to wrest control of the knife from the victim and stab the victim a total of five times, one wound proving fatal. Wells said he then picked up the gun and tried to leave through the rear door, but he could not turn the handle stem to open it, whereupon he came back into the restaurant.
Mr. Vazquez testified that he found the defendant a few feet from his son, and he kicked a gun that was near the defendant’s hand away from the defendant. This accounts for the gun being found on the carpeted area a couple of feet from the feet of the victim, and not on the nearby tile floor where the defendant was found and the magazine of the gun and the knife were located.
The physical evidence recovered at the crime scene supports a finding that only one shot was fired inside the restaurant. One spent bulleVpellet was | («recovered inside the restaurant’s small office. The gun from which that bullet had been fired was found on the floor of the dining room of the restaurant. The gun had one fired cartridge casing inside of it that had not been ejected. Thus, the gun effectively was inoperable. Only that one spent cartridge casing was recovered from the crime scene. DNA tests on a swab of blood taken from the gun were consistent with Wells being the donor of the blood, with the victim being excluded as a contributor of that blood sample. DNA test results of a blood sample from the knife blade were consistent with the victim being the major contributor. While DNA expert Anne Montgomery testified that she found two weak indications of a “potential” minor contributor as to that same blood sample, and she could not exclude the defendant as a minor contributor to that DNA, she could not say more conclusively who that minor contributor was because there was not enough genetic information present. Ms. Montgomery testified that DNA test results of a blood sample from the handle of the knife were consistent with the defendant being the major contributor and with the victim being a minor contributor.
The DNA test results are not clearly inconsistent with Wells’ testimony/story, down to the absence of the victim’s blood on the gun — because no evidence was shown that the victim was bleeding at the time the defendant claimed the victim had control of the gun. The defendant claimed that after he fatally stabbed the victim, he picked up his ex-girlfriend’s gun and went to the rear of the restaurant, trying to get out, but could not turn the handle stem (the handle was broken off) to get out, whereupon he backtracked into the restaurant dining area. The DNA test results are also consistent with the view that the victim never handled the gun. The only DNA evidence from the gun was derived from a swab IflflOf a bloodstain that was on the gun. No non-blood DNA evidence or fingerprints were obtained from the gun.
The testimony established that at the time of the killing, Wells was unemployed, having had his Louisiana commercial driver’s license suspended and losing his job as a commercial eighteen-wheeler truck driver. He and his girlfriend had broken up, and the defendant had moved into his sister’s home, where he was sleeping in her den. Wells testified that on the day he met the victim, he was traveling on his brother’s bus pass to his sister’s home, when he got off the bus to walk to his mother’s *274 home and borrow money from her. The defendant testified that his mother was not at home so he got back on the bus to go to his aunt’s home to borrow money from her. However, according to the defendant, when he got off the bus to walk to his aunt’s home and borrow money from her, the victim, stopped in his truck at a red traffic signal, offered him a ride, and then solicited him to perform oral sex on him, agreeing to pay the defendant $200 and arranging to meet him later that night.
While the defendant testified that he had a job lined up to drive a truck, and he and his other witnesses claimed he had gone out with his sister’s husband and his friends to celebrate his (the defendant’s) good fortune the night before and early morning of the killing, the defendant was still unemployed and residing in his sister’s den at the time of the killing.
Wells’ primary attack on the sufficiency of the evidence is directed to the credibility of two witnesses, Mr. Ricks, one of the defendant’s former fellow inmates in OPP, and Me. Rivera, an EMS paramedic who was at both the scene of the killing and in the rear of the ambulance in which the defendant was transported from the scene to the hospital for treatment. As previously discussed in detail, Mr. |70Ricks testified that while he and the defendant were in the MOU in July 2003, after the murder, the defendant related to him that he (the defendant) had gone to the restaurant intending to rob the restaurant, having inside information from an employee or former employee that restaurant cash receipts were kept in a filing cabinet. The deceased’s father, Mr. Vazquez, testified that currency receipts from the -previous day were kept in the office desk drawer. Mr. Ricks testified that the defendant told him that the victim had shot him twice, which was consistent with the defense theory of the case and the defendant’s own testimony. The lead homicide detective ■ investigating the case, Detective Williams, confirmed in his redirect examination testimony that Mr. Ricks provided him with information that only the perpetrator would have known.
Mr. Rivera testified that he asked the badly wounded Wells at the scene what happened, and the defendant replied that there was a robbery and “they” went out the back. Mr. Rivera testified that in the ambulance he asked the defendant if he had done it. He said the defendant replied with a simple “yes,” and that a few minutes later the defendant said: “I can’t believe I did this, I can’t believe I did this, I can’t believe I did this.” Mr. Rivera testified that he recorded that the defendant was alert and oriented from his first examination of the wounded Wells inside the restaurant until they arrived at the hospital. Mr. Rivera conceded that hé did not put in his report that the defendant told him that he could not' believe he had done what he had done, but he maintained that he gave this information to the police.
The defense presented the testimony of Mr. Davidson, one of the victim’s former high school classmates who worked at the Vazquez Seafood Restaurant as a cashier for approximately two months in what he recalled had to have been in 1994 |71or 1995. Mr. Davidson testified that one day he and other employees were making up eating utensil sets in napkins. Mr. Davidson testified that he had spread his legs apart to (lower his torso and) bring his hands down closer to the table so as to be in a more comfortable task position, when the victim came out of his office joking around with the workers and asked Mr. Davidson why his legs were spread apart like that, saying it looked like he was about to spread his butt cheeks. Mr. Davidson testified that he was offended by the re *275 mark because “it was a homosexual remark and I'm not homosexual.”
Reviewing all the record evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant, carrying the gun purchased by his ex-girlfriend four days earlier, accosted the victim on the morning of 11 July 2003 with the intent to rob him at gunpoint, and that the robbery plan went awry when the victim fought the defendant, with one bullet being fired from the gun by either the defendant or the victim, after which it jammed. During a vicious struggle, the defendant was severely stabbed, and he fatally stabbed the victim
Further reviewing all the record evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant was the aggressor in the confrontation with the victim; he did not withdraw from the conflict in good faith; and thus he cannot claim the right of self-defense.
We find no merit to Wells’ claim that the evidence was insufficient to support his conviction for second degree murder.
ASSIGNMENTS OF ERROR NOS. 1, 2, 3, 4, 5, 6, AND 7
haWells’ first seven assignments of error concern two prospective jurors and one juror that was actually deliberating the case, all of whom were dismissed on challenges for cause by the state because they had prior felony convictions for which none had received a governor’s pardon.
The defendant was indicted and tried for first degree murder, thus requiring a death-penalty qualified and sequestered jury. The separate death-penalty voir dire was designed to select a venire composed of prospective jurors who could vote to sentence the defendant to death should he be found guilty as charged, but who had no predisposition to impose either that sentence or the alternate sentence of life imprisonment.
Following the initial death-penalty voir dire, general voir dire of approximately 57 prospective death-qualified jurors commenced on 30 November 2009.[5] On that date, during the general voir dire, the state challenged two prospective jurors for cause from a selected, but unsworn, panel of twelve jurors. The state challenged Juror Jackson and Juror Cotlon for cause on the ground that they had felony convictions for which they had not received pardons, and thus they were not qualified to serve as jurors under La. C.Cr.P. art. 401 A(5)(“In order to qualify to serve as a juror, a .person must ... [n]ot ,.. have been convicted of a felony for which he has not been pardoned.”)
The trial court removed prospective Jurors Jackson. and Cotlon on the state’s challenges for cause over the objections of defense counsel. Subsequently, on Í5 December 2009, during deliberations, a juror advised the court that Juror Magee, a fellow juror participating in deliberations, was a convicted felon who had her mind made up coming into deliberations. The trial court questioned Juror Magee, who 1^admitted she had previously been.convicted of a felony, although she confirmed that she had received a. “first-pffender” pardon. The trial court removed her on a challenge for cause by the state and replaced her with an alternate juror, over the objection of the defendant.
Pursuant to La. C.Cr.P. art. 797(1), it is a proper challenge for cause by the state or the defendant that “[t]he juror lacks a *276 qualification required by law.” La. C.Cr.P. art. 800 B provides:
The erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law.
The record in the present case reflects that the state exhausted its allotted twelve peremptory challenges for the regular panel. In his appellate brief, Wells asserts that the state used all of it peremptory challenges; the state does not dispute that representation. Accordingly, under La. C.Cr.P. art. 800 B, the defendant has a complaint for the alleged erroneous challenges for cause granted to the state for Jurors Jackson, Cotlon, and Magee.
As to the trial court’s removal of Jurors Jackson and Magee, at issue is whether the so-called “automatic” first-offender pardon for first-felony convicted felons provided for by La. R.S. 15:572 and La. Const. (1974) Art. IV, § 5(E)(1) ■ sufficed for the pardon contemplated by La. C.Cr.P. art. 401 A(5), and thus for qualification to serve as a juror under La. C.Cr.P. art. 401. Juror Cotlon was removed because he had a prior U.S. Army court-martial conviction for attempted pandering, for which he had not been pardoned. The issue as to Juror Cotton’s ^removal was whether the offense for which he had been court-martialed would have been a felony in Louisiana.
“The question of a juror’s qualifications is addressed to the sound discretion of the trial judge.” State v. Lewis, 12-0803, pp. 18-19 (La.App. 4 Cir. 9/25/13), 125 So.3d 1252, 1263.

Juror Cotlon

Wells first complains that the trial court erred in removing Juror Cotlon from the jury because the circumstances of the offense of attempted pandering to which he had pleaded guilty or had been adjudicated guilty in a U.S. Army court-martial would not have constituted a felony offense in Louisiana. In the 30 November 2009 general voir dire, Juror Cotlon was provisionally accepted. However, when the trial court asked for backstrikes, the state said that while it was not going to backstrike Juror Cotlon, he was a convicted felon from a military court-martial and thus was not qualified to serve as a juror.
Upon defense counsel’s objection that the state had not shown Juror Cotlon had been convicted of a felony as contemplated by La. C.Cr.P. art. 401 A(5), the trial court questioned him, and he confirmed that he had been court martialed and found guilty of “pandering” (“pandering” is a felony offense in Louisiana — La. R.S. 14:84: imprisonment with or without hard labor for not more than five years.). On 1 December 2009, a hearing was had at which the court addressed the issue of whether Juror Cotton’s military court-martial adjudication/conviction for pandering was a “felony” conviction for purposes of his disqualification from jury service under La. C.Cr.P. art. 401 A(5). The state presented documents that Juror Cotlon had been convicted of attempted pandering, as will be discussed more fully below, and the trial court found that it was a conviction baiTing jury service for 17fiwhich Juror Cotlon had never been pardoned. The trial court excused Juror Cotlon over a defense objection that there had been insufficient evidence to establish a prior conviction for an offense that would constitute a felony in Louisiana, and an objection as to the timing of the state’s raising the issue.
The issue of a first-offender pardon was also discussed as to Juror Cotlon. Howev *277 er, Wells neither objected at trial on the first-offender pardon issue, nor does he argue on appeal that Juror Cotton was ever pardoned for his conviction. Thus, we find no first-offender pardon issue on appeal insofar as Juror Cotton, as there is with Juror Jackson and Juror Magee, the juror removed during deliberations.
Wells sought supervisory review of the trial court’s disqualification of Juror Cotton, and this court denied his writ application. State v. Wells, 09-1629, unpub. (La.App. 4 Cir. 12/4/09)(“The writ application of the relator, Tyrone Wells, is denied.”). In a one-page per curiam filed in connection with the writ application, the trial court stated that it found that the offense for which Juror Cotton had been court-martialed, attempted pandering, was the equivalent of a felony because “the sentencing range for attempted pandering is greater than one year.” The defendant attacks the trial court’s reasoning and conclusion that attempted pandering is a felony. However, for the following reasons, the trial court correctly concluded that the offense to which Juror Cotton pleaded guilty in the court-martial,.attempted pandering, would be a felony under Louisiana law.
Attached to the state’s 1 December 2009 written Motion to Disqualify Juror Cotton was a copy of a FBI.rap sheet/criminal history record of Juror Burnell Cotton. The rap sheet reflects that Juror Cotton was arrested on 11 November 2000, for kidnapping and pandering, while stationed with the Unites .States Army |7fiat Fort Belvoir, Virginia. A disposition from 28 February 2001 reflects that he was referred for court-martial only on the pandering charge. A 17 July 2001 disposition entry reflects that he was found guilty or pleaded guilty in a court-martial to attempted pandering; was reduced in rank, forfeiting all pay; was sentenced to confinement for five years; and was dishonorably discharged. The rap sheet reflects that he was either paroled on 14 March 2003 and/or was still on parole on that date in New Orleans.
The defendant correctly cites that in order to determine whether a conviction from another jurisdiction constitutes a felony in Louisiana, a Louisiana court must determine the analogous Louisiana offense according to the nature, of the act involved in the crime of the other jurisdiction. State v. Sandoval, 09-0542, p. 6 (La.App. 4 Cir. 2/8/10), 32 So.3d 914, 918, citing State v. Carouthers, 618 So.2d 880, 882 (La.1993).
Members of the United States Military are subject to the Uniform Code of Military Justice and the Manual for Courts-Martial, United States. See Captain Gregory E. Maggs, Judicial Review of the Manual for Courts-Martial, 160 Mil.L. Rev. 96, 157 (1999). Part IV of the Manual for Courts-Martial (MCM) sets forth the “Punitive Articles,” including “crimes and offenses not capital,” under Article 134. 10 U.S.C. § 934 provides for Article 134 court-martials.[6] MCM (2008) Pt. IV, ¶ 97.b, Art. 134, sets forth the elements of the separate offenses of “(1) | ^Prostitution;” “(2) “Patronizing a prostitute;” “(3) Pandering by inducing, enticing, or procuring act of prostitution;” and “(4) Pandering by arranging or receiving consideration for *278 arranging for sexual intercourse or sodomy.”
The elements of the two offenses of pandering are set forth by MCM (2008) Pt. IV., ¶ 97.b (3) and (4), Art. 134, respectively, as follows:

(S) Pandering by inducing, enticing, or procuring act of prostitution.

(a) That the accused induced, enticed, or procured a certain person to engage in an act of sexual intercourse for hire and reward with a person to be directed to said person by the accused;
(b) That this inducing, enticing, or procuring was wrongful;
(c) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
ft) Pandering by arranging or receiving ' consideration for arranging for sexual intercourse or sodomy.
■ (a) That the accused arranged for, or received valuable consideration for arranging for, a certain person to engage in sexual intercourse or sodomy with another person;
(b) That the arranging (and receipt of consideration) was wrongful; and
(c) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. [Emphasis supplied.]
MCM (2008) Pt. IV, ¶ 97.e, Art 134, provides the maximum punishment for pandering: “Dishonorable discharge, forfeiture of all pay and allowances, and confinement for 5 years.” Juror Cotlon’s FBI rap sheet reflects that he was convicted of attempted pandering. MCM (2008) Pt. IV, T4.e, Art. 80, provides that any person found guilty of an attempt to commit any offense punishable by confinement for twenty years or less, or other punishment, “shall be subject to the same maximum punishment authorized for the commission of the offense ^attempted, .. Juror Cotlon’s rap sheet appropriately reflects that for his court-martial for attempted pandering, he received the maximum punishment for the completed crime of pandering — dishonorable discharge, forfeiture of all pay, and confinement for five years.
La. R.S. 14:84, as in effect in 2009 (having been last amended prior thereto in 1980), proscribed the crime of pandering, and stated as follows:
Pandering is any of the following intentional acts:
(1) Enticing, placing, persuading,, encouraging, or causing the entrance of any person into the practice of prostitution, either by force, threats, promises, or by any other device or scheme.
(2) Maintaining a place where prostitution is habitually practiced.
(3) Detaining any person in any place of prostitution by force, threats, promises, or by any other device or scheme.
(4) Receiving or accepting by a person as a substantial part of support or maintenance anything of value which is known to be from the earnings of any person engaged in prostitution.
(5) Consenting, on the part of any parent or tutor of any person, to the person’s entrance or detention in the practice of prostitution.
(6) Transporting any person from one place to another for the purpose of promoting the practice of prostitution.
Whoever commits the crime of pandering shall be fined not more than five thousand dollars, imprisoned with or without hard labor for not more than five years, or both. [Emphasis supplied.]
*279 “Prostitution” is defined in pertinent part by La. R.S. 14:82 A(l) as “[t]he practice by a person of indiscriminate sexual intercourse with others for compensation.”
Wells argues that the offense of pandering (and attempted pandering) as defined in the MCM would equate to the misdemeanor offense of soliciting (and | ^attempted soliciting) for prostitutes/ soliciting for prostitutes being defined in 2009 by La. R.S. 14:83 (having last been amended prior thereto in 1980) as follows:
Soliciting for prostitutes is the soliciting, inviting, inducing, directing, or transporting a person to any place with the intention of promoting prostitution.
Whoever commits the crime of soliciting for prostitutes shall be fined not more than five hundred dollars, imprisoned for not more than six months, or both.
La. R.S. 14:2(4) defines a felony as “any crime for which an offender may be sentenced to death or imprisonment at hard labor.” [Emphasis supplied.] Pandering, in violation of La. R.S. 14:84, is punishable by imprisonment with or without hard labor, and thus it is a felony. La. R.S. 14:27 defines “attempt,” and provides in subpar-agraph D(3) that whoever attempts to commit a crime such as pandering — by virtue of the punishment prescribed therefor upon conviction — “shall be fined or imprisoned or both, in the same manner as for the offense attempted; siich fine or imprisonment shall not exceed one-half of the largest fine, or one-half, of the longest term of imprisonment prescribed for the offense so attempted, or both.” Thus, attempted pandering under La. R.S. 14:84 is a felony because it is punishable by imprisonment with or without hard labor (for not more than two and one-half years). Soliciting for prostitutes under La. R.S. 14:83 is a misdemeanor, as is attempted soliciting for prostitutes.
The definitions of “attempt” as proscribed by MCM (2008) Pt. IV, ¶ 4.a (a), Art. 80, and by La. R.S. 14:27 A and B,[7] are analogous — specific intent to commit 180the crime; doing an act tending to accomplish the crime, mere preparation being insufficient; regardless of whether the crime is accomplished.
For the following reason, we find no merit to the defendant’s argument. It can fairly be said that a person who committed the offense of attempted pandering, having the specific intent to commit the offense of pandering as proscribed by MCM (2008) Pt. IV, ¶ 97.b (3)(1), also committed the Louisiana offense of attempted pandering under La. R.S. 14: (27)84(1).
Accordingly, the trial court did not abuse its discretion in removing Juror Cot-Ion from service as a juror in the present case pursuant to La. C.Cr.P. art. 401 A(5), on the ground that he had a conviction for committing an offense which would be a *280 felony in Louisiana, for which he had not received any type of pardon.

Juror Jackson

La. C.Cr.P. art. 401 A(5), setting forth the general qualifications for jurors, as in effect at the time of the defendant’s 2009 trial in the present case, stated in pertinent part:
A.In order to qualify to serve as a juror, a person must:
[[Image here]]
(5) Not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned.
|s1The primary issues insofar as excusing/removing Juror Jackson were (1) whether a person convicted of a first-offense felony, and thus eligible for a so-called “automatic first-offender pardon” under La. R.S. 15:572 and La. Const. (1974) Art. IV, § 5(E)(1), had been “pardoned” within the meaning of La. C.Cr.P. art. 401 A(5) and thus was qualified to serve as a juror; and (2) whether Juror Jackson, in fact, had such a first-offender pardon.
La. R.S. 15:572 provided at the time of trial, and presently provides, in pertinent part, that:
B.(1) A first offender never previously convicted of a felony shall be pardoned automatically upon completion of his sentence without a recommendation of the Board of Pardons and without action by the governor.
(2) No person convicted of a sex offense as defined in R.S. 15:541 or determined to be a sexually violent predator or a child predator under the provisions of R.S. 15:542.1 et seq. shall be exempt from the registration requirements of R.S. 15:542.1 et seq., as a result of a pardon under the provisions of this Subsection.
(3) Notwithstanding any provision of law to the contrary, no pardon shall be issued to a first offender unless that person has paid all of the court costs which were imposed in connection with the conviction of the crime for which the pardon is to be issued.
C. For the purposes of this Section, “first offender” means a person convicted within this state of a felony but never previously convicted of a felony within this state or convicted under the laws of any other state or of the United States or of any foreign government or country of a crime which, if committed in this state, would have been a felony, regardless of any previous convictions for any misdemeanors. Convictions in other jurisdictions which do not have counterparts in this state will be classified according to the laws of the jurisdiction of conviction.
D. On the day that an individual completes his sentence the Division of Probation and Parole of the Department of Corrections, after satisfying itself that (1) | rathe individual is a first offender as defined herein and (2) the individual has completed his sentence shall issue a certificate recognizing and proclaiming that the petitioner is fully pardoned for the offense, and that he has all rights of citizenship and franchise, and shall transmit a copy of the certificate to the individual and to the clerk of court in and for the parish where the conviction occurred. This copy shall be filed in the record of the proceedings in which the conviction was obtained. However, once an automatic pardon is granted under the provisions of this Section, the individual who received such pardon shall not be entitled to receive another automatic pardon.
E. Notwithstanding any provision herein contained to the contrary, any *281 person receiving a pardon under, the provisions of Subparagraph (1) of Paragraph (E) of Section 5 of Article IV of the Louisiana Constitution of 1974 and this Section may be charged and punished as a second or multiple offender as provided in R.S. 15:529.1.
The governor’s power to pardon and the first-offender pardon are both provided for by La. Const. (1974) Art. IV, § 5(E)(1), which stated, in 2009 and presently:
(1) The governor may grant reprieves to persons convicted of offenses against the state and, upon favorable recommendation of the Board of Pardons, may commute sentences, pardon those convicted of offenses against the state, and remit fines and forfeitures imposed for such offenses. However, a first offender convicted of a non-violent crime, or convicted of aggravated battery, second degree battery, aggravated assault, mingling harmful substances, aggravated criminal damage to property, purse snatching, extortion, or illegal use of weapons or dangerous instrumentalities never previously convicted of a felony shall be pardoned automatically upon completion of his sentence, without a recommendation of the Board of Pardons and without action by the governor.
When the state first raised the issue of jurors with felony convictions being barred from jury service, it argued that Juror Jackson was not entitled to serve as a juror because the offense for which he had been convicted, distribution of cocaine, was not subject to a first-offender pardon. The state further argued that even if | ⅞¾Juror Jackson could have received a first-offender pardon for that offense, it had checked and determined that Juror Jackson had not paid all of his court costs imposed in connection with the conviction, and thus he was not entitled to a first-offender pardon. See La. R.S. 15:572 B(3)(“no pardon shall be issued to a first offender unless that person has paid all of the court costs ....”). Contemporaneous with this argument and the trial court’s decision to remove Juror Jackson, defense counsel merely objected to the timing of the state bringing up this issue, not as to the merits of the bar to Juror Jackson’s service on the jury.[8]
The defense noticed its intent to seek supervisory review in this court of the trial court’s ruling as to Juror Jackson. However, on 1 December 2009, in between the 30 November 2009 excusing of prospective Juror Jackson and prospective Juror Cot- . Ion and the 15 December 2009 removal of Juror Magee, the trial court held a hearing on the issue at which argument was had as to Juror Jackson (and Juror Cotlon).
The following day, 2 December 2009, the trial court conducted a hearing at the request of the defense concerning the purported first-offender pardon issue as to Juror Jackson, at which witnesses testified.
Peter Cadaro Jr., an Orleans parish jury commissioner for approximately twenty-one years, testified on behalf of the defense that when a person called for jury duty discloses on the jury summons that he or she has been convicted of a felony, he questions them about the felony and, if appropriate, he sends them to the Louisiana Department of Corrections, Division of Probation and Parole office in New Orleans, with an application to present to David Lindsey for a first-offender | ^pardon. Mr. Cadaro testified that this process was recently done with Juror *282 Jackson. He stated that he had spoken to Mr. Lindsey that same morning, who informed him that Juror Jackson had a first-offender pardon. Mr. Cadaro testified on cross examination that Mr. Lindsey had faxed him a copy of Juror Jackson’s pardon the prior day, which he identified in court as dated 12 May 1999. Mr. Cadaro was also questioned as to a notation or “footnote” on the face of the jury summons setting forth the first-offender provision of La. R.S. 15:572. When asked who was responsible for that notation, Mr. Cadaro testified that he believed the judges, en banc, ordered it placed on jury summonses two or three years previous. Mr. Cadaro confirmed that what was done with Juror Jackson was standard procedure — he said he had a conviction, and they sent him over to probation and parole to see if he qualified for a first-offender pardon. The clear thrust of Mr. Cadaro’s testimony was that the jury commission office considered persons with one felony conviction and a first-offender pardon for that conviction to be qualified to serve on juries.
David Lindsey, then the District Administrator for the Department of Public Safety and Corrections, Division of Probation and Parole, testified that he retracted Juror Jackson’s first-offender pardon after he had initially faxed the pardon to Mr. Cadaro because of the issue as to whether the “fines” noted in Juror Jackson’s docket master (no “court costs” per se were assessed) had been paid. See La. R.S. 15:572 B(3)(no pardon shall be issued to a first offender unless he has paid all the court costs imposed in connection with the conviction). Ultimately, Mr. Lindsey could not say that Juror Jackson had a first-offender pardon.
Lynn Dantin testified that he collected fines and fees for four sections of Orleans Parish Criminal District Court, including Section “D,” where Juror [⅞Jackson had been: convicted of the felony in question. He said there was no record of Juror Jackson having paid any fines or fees, and the docket master for the case would have reflected it had he done so.
In argument on the issue in the trial court, the state cited State v. Jacobs, 04-1219 (La.App. 5 Cir. 5/31/05), 904 So.2d 82, where the court stated that the defendant claimed the trial court erred in denying his motion to quash his grand jury indictment because, inter alia, “convicted felons, even those receiving first offender pardons, are excluded from grand jury service,” Id., 04-1219, p. 12, 904 So.2d at 90-91. However, the defendant in Jacobs merely argued that La. C.Cr.P. art. 401 A(5) was unconstitutional because the right to serve on a jury was .one of the rights restored to ex-convicts by operation of La. Const. (1974) Art. I, § 20, which states, in part: .“Full rights of citizenship shall be restored upon termination of state and federal supervision following conviction for any offense.” The court found that the restoration of rights under La. Const. (1974) Art. I, § 20 did not restore a convict’s right to sit on a jury; the provision only covered “basic rights such as the right to vote, work, or hold public office.” Jacobs, 04-1219, p. 12-13, 904 So.2d at 91. The court further cited La. Const. (1974) Art. V, § 33(A), which provides that any citizen of Louisiana who has reached the age of majority is eligible to serve as a juror within the parish in which he is domiciled, but also providing that “[t]he legislature may provide additional qualifications.” Thus, the court in Jacobs found the legislature acted well within its constitutional authority in instituting the qualifications of La. C.Cr.P. art. 401 A(5). No direct reference was made in Jacobs to the first-offender pardon provisions of La. Const. (1974) Art. IV, § 5(E)(1) or La. R.S. 15:572. The Louisiana Supreme Court denied | ^defendant's application for a writ of certiorari and/or *283 review to this decision in State v. Jacobs, 05-2072 (La. 4/28/06), 927 So.2d 282 (“Denied.”).
The trial court in the present case stated that, based on Jacobs, and the Supreme Court’s writ denial in the case, it was holding that Juror Jackson was disqualified from serving as a juror. Wells sought supervisory review of that decision as to Juror Jackson in this court, and this court granted the defendant’s writ application and reversed the trial court based on the plain language of La. C.Cr.P. art. 401 A(5) and the first-offender provision of La. R.S. 15:572, stating, in pertinent part: “Because we find [La. C.Cr.P. art. 401 A(5) ] clear and unequivocal, we find the trial court erred in its ruling that felons pardoned by operation of law are ineligible for jury service under La. C.Cr.P. art. 401.” State v. Wells, 09-1627, p. 2, unpub. (La.App. 4 Cir. 12/3/09). The state applied for supervisory and/or remedial writs, and the Supreme Court granted the writ and reversed, reinstating the ruling of the trial court without reasons. State v. Wells, 09-2626 (La. 12/4/09), 23 So.3d 900 (“Writ granted. The Court of Appeal decision is reversed and vacated, and the trial court judgment is reinstated.”).
The state first argues that the “law of the case” doctrine should bar this court from considering the defendant’s assignment of error as to whether convicted felons with first-offender pardons are nevertheless disqualified to serve on juries. The state also argues , the merits of the issue, citing the Louisiana Fifth Circuit Court of Appeal’s decision in Jacobs, and the subsequent writ denial by the -Louisiana Supreme Court.
Under the “law of the case” doctrine, a court of appeal generally refuses to reconsider its own rulings of law in a subsequent appeal in the same case. State v. Duncan, 11-0563, p. 26 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 520. The law of 187the case doctrine applies to all prior rulings or decisions of an appellate court or the Supreme Court in the .same case, not merely those arising from the. full- appeal process. State v. Molineaux, 11-0275, p. 3 (La.App. 4 Cir. 10/19/11), 76 So.3d 617, 619. The policy applies to parties who were parties to the case when the former decision was rendered and who thus had their day in court. State v. Cox, 11-0670, p. 6 (La.App. 4 Cir. 2/22/12), 85 So.3d 252, 256. The “law of the case” doctrine seeks to avoid relitigation of the same issue; promote consistency of result in. the same litigation; and promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue. Id.
The principle is discretionary, and this court will generally not follow the doctrine if the prior ruling was clearly erroneous and would result in manifest injustice. State v. Watson, 99-1448, p. 21 (La.App. 4 Cir. 8/23/00), 774 So.2d 232, 243. However, this court has held that an appellate court will not reverse its pretrial determinations unless the defendant presents new evidence tending to show that the decision was patently erroneous and produced an unjust result. Duncan, supra; State v. Gillett, 99-2474, p. 5 (La.App. 4 Cir. 5/10/00), 763 So.2d 725, 728. Although a different decision on appeal is not absolutely precluded, judicial efficiency demands that great deference be accorded to the earlier decision. State v. Santamarina, 10-0028, p. 2 (La.App. 4 Cir. 11/10/10), 51 So.3d 822, 824, citing Gillett, supra.
In the case of Juror Jackson, this court granted Wells’ writ application and ruled on the merits that the trial court had erred in finding that convicted felons pardoned by operation of law (as first-felony-offenders) are ineligible for jury service *284 under La. C.Cr.P. art. 401. The Supreme Court granted the state’s 1 ««application for writs, reversed this court’s decision, and reinstated the ruling of the trial court that Juror Jackson was not qualified to serve. Such became the law of the case; unlike Jacobs, where the Supreme Court denied the writ application, the denial of the writ did not create law of the case.
Further, we note that the defendant’s writ application in number 2009-1627 (cited fully supra) contained a full transcript of the 2 December 2009 hearing at which local and state officials testified as to the first-offender pardon and specifically as to whether Juror Jackson had one. No new evidence was subsequently adduced at any point in the proceedings as to this issue concerning Juror Jackson. Considering the Supreme Court’s reversal of this court’s grant of Wells’ writ application and decision on the merits that the trial court erred in finding that convicted felons pardoned by operation of law were ineligible to serve under La. C.Cr.P. art. 401, application of the law of the case doctrine is most appropriate in this matter. Accordingly, the application of the law of the case doctrine precludes reconsideration of this issue as to Juror Jackson.
Further, aside from a strict application of the law of the case doctrine, the Louisiana Supreme Court has definitively spoken to the issue of whether Juror Jackson was qualified to serve as a juror on this case— he is not. This court is not free to disregard the obvious import of that decision. The Supreme Court gave no reasons for its writ grant and decision in Wells. However, aside from the merits of the issue as to whether a first-offender pardon is sufficient under La. C.Cr.P. art. 401 A(5) to qualify a convieted-felon as eligible to serve as a juror, it is to be noted that, in his testimony at the 2 December 2009 hearing on whether Juror Jackson had a first-offender pardon, Louisiana Department of Corrections, Division of Probation and Parole, District Director David Lindsey ultimately could not say ^whether Juror Jackson, in fact, had a valid first-offender pardon. Therefore, the Supreme Court could have based its writ decision in Wells solely on the issue that because of this equivocation as to whether Juror Jacks on had a valid first-offender pardon for his felony conviction, it could not say that the trial court abused its discretion in determining that Juror Jackson was not qualified to serve as a juror under La. C.Cr.P. art. 401 A(5).
Accordingly, the merits of the issue of whether La. C.Cr.P. art. 401 A(5) applies only to a governor’s pardon, and not a first-offender pardon, might be immaterial to resolve the matter of Juror Jackson’s removal on the challenge for cause by the state. He was a convicted felon, and the record did not definitively establish that he had either a valid first-offender pardon or a governor’s pardon. Therefore, he was not qualified to serve as a juror under La. C.Cr.P. art. 401 A(5), and the trial court properly granted the state’s challenge for cause pursuant to La. C.Cr.P. art. 797(1).
As to the merits of that issue, however, which arose again as to the removal of Juror Magee during deliberations, we note that La. C.Cr.P. art. 401 was enacted in 1966 with the revision that year of the Louisiana Code of Criminal Procedure, which became effective on 1 January 1967. At that time, Art. V, § 10 of the Louisiana Constitution of 1921 merely set forth the power of the governor to grant pardons.[9] *285 It contained no mention of, or provision for, a first-offender or |fln“automatic” pardon — nor had any other Louisiana state constitution, dating back to the-first, the Constitution of 1812, enacted after Louisiana gained statehood that same year.
As enacted in 1966, La. C.Cr.P. art. 401(5) provided that “[i]n order to qualify to serve as a juror a person must: ... (5) Not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned.” This is the precise language of the provision in effect at all times pertinent to the present ease— the subparagraph was designated as La. C.Cr.P. art. 401 A(5) by La. Acts 1984, No. 655.
Paragraph (c) of the Official Revision Comment — 1966, to La. C.Cr.P. art. 401 states: “The new provision concerning pardon is adopted from a similar provision formerly contained in R.S. 13:3041.” La. R.S. 13:3041 then, at all times pertinent to the present case, and presently, provides for the qualifications for service as a civil juror. As enacted (or amended) by La. Acts 1898, No. 135, La. R.S. 13:3041 provided, in pertinent part, that the qualifications of a juror in any civil case “are: ... (3) He must not be charged with any crime or offense at the time of his jury service, nor have been convicted previously of any crime or offense punishable by hard labor for which he had not been pardoned.” There was no first-offender pardon existing in Louisiana statutory or constitutional law in 1898, and La. R.S. 13:3041 has never contained any reference to a first-offender pardon. Since amendment by La. Acts 1966, No. 313, (coinciding with the effective date of the 1966 revision to the Louisiana Code of Criminal Procedure and enactment of La. C.Cr.P. art. 401), La. R.S. 13:3041 has simply provided that Lithe qualifications for jurors in civil cases are as required by Article 401 of the Louisiana Code of Criminal Procedure.
La. R.S. 15:572 was enacted by La. Acts 1928, No. 2, tracking Art. V, § 10 of the Louisiana Constitution of 1921, and providing for pardons by the governor, with no reference to or provision for a first-offender pardon.[10]
It was not until 1968 that Art. V, § 10 of the Louisiana Constitution of 1921 and La. R.S. 15:572 were both amended to add a provision for first-offender pardons, through insertion of the following identical clause at the end of the first sentence of each respective provision, after a semicolon: “provided, however, that each first offender who has never been convicted previously of a felony shall be eligible for pardon automatically upon completion of his sentence without the aforementioned recommendation in writing.” See, respectively, La. Acts 1968, No. 662 and La. Acts 1968, No. 186. The governor and first-offender pardon provisions are now Con *286 tained in Art. IV, § 5(E)(1)[11] of the Louisiana Constitution of 1974, with the corresponding statutory provisions in La. R.S. 16:572.
Given that the pardon by the governor was the only pardon referred to by Louisiana constitutional and statutory law at the time La. C.Cr.P. art. 401 was |92enacted, it is clear that at the time of its enactment in 1966, La. C.Cr.P. art. 401(5) did' not apply to any type of pardon other than a governor’s pardon.
After the first-offender pardon was adopted two years later in 1968 by amendment to La. Const. (1921) Art. V, § 10 and La. R.S. 15:572, La. C.Cr.P. art. 401(5)(now La. C.Cr.P. art. 401 A(5)) remained unchanged for forty-two years, until 2010.
In the 2010 regular session of the Louisiana Legislature — the first regular legislative session following Wells’ December 2009 second trial and conviction in this case — La. C.Cr.P. art. 401 A(5) was amended by La. Acts 2010, No. 438, to add three words: “by the governor.” La. C.Cr.P. art. 401 A(5) now states that in order to qualify to serve as a juror a person “must ... (5) Not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned by the governor.” [Emphasis supplied.] Thus, as of the effective date of this 2010 amendment, it is definitive that a person convicted of a felony for which he has not been pardoned by the governor is not qualified to serve as a juror in Louisiana, regardless of whether or not he has a first-offender pardon pursuant to La. Const. (1974) Art. IV, § 5(E)(1) and La. R.S. 15:572 B.
As to the merits of the issue regarding whether the pardon contemplated by La. C.Cr.P. art. 401 A(5), as in effect at the time of the 2009 voir dire, was a pardon by the governor to the exclusion of the first-offender pardon, Wells avers-that, unlike the cases the state claimed resolved the issue, he is not challenging the constitutionality of La. C.Cr.P. art. 401- A(5), but instead simply requests that this court apply the rules of statutory interpretation and enforce the straightforward reading of that provision.
| naWells also cites State v. Jones, 03-0829 (La.App. 4 Cir. 12/15/04), 891 So.2d 760, where a defendant filed'a motion for new trial on the ground that a juror on his case had previously been convicted of aggravated burglary, although the juror had provided that information to the Jury Commission. The state argued that, as a first offender, the juror had automatically been pardoned, and thus he was qualified to serve as a juror under La. C.Cr.P. art. 401 A(5). The trial court found that the prospective juror had been qualified to serve as a juror because of his first-offender pardon. This court noted that La. R.S. 15:572 provided that a person pardoned as a first offender “has all rights of citizenship and franchise.” Jones, 03-0829, p. 26, 891 So.2d at 778. This court held that Mr. Jones had failed to show that the trial court had erred in finding that the juror was qualified to serve as a juror, and that the court “properly denied his motion for a new trial as to that ground.” Id., 08-0829, p. 27, 891 So.2d at 778.
Wells argues that in Jones this court “indicated that it was not erroneous for a court to qualify and seat a juror who had a *287 first offender pardon,” conceding that the issue “arose in a different posture.”
In cases of statutory construction or interpretation, legislative intent is a fundamental question, and the well-established rules of statutory construction are designed to ascertain and implement the intent of the statute. Boudreaux v. Louisiana Dept. of Public Safety and Corrections, 12-0239, p. 4 (La. 10/16/12), 101 So.3d 22, 26. Legislation is the solemn expression of the legislative will; therefore, the interpretation of a law primarily involves the search for the legislature’s intent. Red Stick Studio Dev., L.L.C. v. State ex rel. Dep’t of Econ. Dev., 10-0193, pp. 10-19 (La. 1/19/11), 56 So.3d 181, 187. The starting point in ascertaining legislative intent is the language of the statute itself. Livingston Parish Council on Aging v. Graves, 12-0232, p. 4 (La. 12/4/12), 105 So.3d 683, 685. When examining that language, • words' and phrases are to be read in their context and to be accorded their generally prevailing meaning. La. C.C. art. 11; La. R.S. 1:3. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the intent of the legislature. See La. C.C. art. 9; In re Succession of Faget, 10-0188, pp. 8-9 (La. 11/30/10), 53 So.3d 414, 420.
Our courts have said many times that the legislature is presumed to enact each statute with deliberation and with full knowledge of all existing law on thé same subject. See M.J. Farms, Ltd. v. Exxon Mobil Corp., 07-2371, p. 13 (La. 7/1/08), 998 So.2d 16, 27, amended on rehearing on other grounds, 07-2371 (La. 9/19/08), 998 So.2d 33. Therefore, “legislative language will be interpreted on the assumption that the Legislature was aware of existing statutes, well established principles of statutory construction and with knowledge of the effect of their acts and purpose,in view.” Id. at p. 14. It is equally well-settled under the rules of statutory construction that, where possible, courts have a duty in the interpretation of a statute to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter. Id.
In applying these principles of statutory construction to the present case, one can readily ascertain from the foregoing discussion that La. C.Cr.P. art. 401 A(5)(designated as La. C.Cr.P. art. 401(5) prior to its 1984 amendment), as in effect at the time of the trial in the present case, and dating back to the 1966 enactment of that provision, plainly stated that: “A. In order to qualify to serve as a juror, a person must: ... (5) Not'... have been convicted of a felony for which he |%has not been pardoned.” La. Const. (1974) Art. IV, § 5(E)(1), providing for the first-offender pardon, became effective at midnight on 31 December 1974. La. R.S. 15:572, as amended by La. Acts 1975, 1st Ex.Sess., Ño. 17, provided for the first-offender pardon and, inter alia, “D. ... [the issuance of] a certificate recognizing and proclaiming that the petitioner is fully pardoned for the offense and that he has all rights of citizenship and franchise _” Further, as discussed, the first-offender pardon provisions were added to both the Constitution of 1921 and La. R.S. 15:572 in 1968.
Applying the rules of statutory construction, following the adoption of La. Const. (1974) Art. IV, § 5(E)(1), with its provision for a first-offender pardon, and noting the amending and reenacting of La. R.S. 15:572 in 1968 and in 1974, also providing for the first-offender pardon — the drafters were aware of then La. C.Cr.P. art. 401(5) and its provision for the qualification of a convicted felon for service as a juror if he had been “pardoned” for that conviction. It *288 necessarily follows that the legislature was aware that, with no limiting language in La. Const. (1974) Art. IV, § 5(E)(1) or La. R.S. 15:572, a person convicted of only one felony for which he had received a first-offender pardon would, as a result of those provisions, be qualified under the plain language of La. C.Cr.P. art. 401(5) to serve as a juror (assuming he also met the other qualifications).
One might argue that, because there was no first-offender pardon when La. C.Cr.P. art. 401(5) (now 401 A(5)) was enacted in 1966, and the provision remained unchanged through Wells’ 2009 trial and conviction, it is not possible that the legislature ever intended it to cover a person convicted of only one felony with a first-offender pardon for that conviction. Or one might argue that the 1968 enactment of the legislation providing for the addition of the first-offender pardon | ^provisions to La. Const. (1921) Art. V, § 10 and La. R.S. 15:572, and the subsequent 1974 enactment of the legislation to include those same first-offender pardon provisions in the 1974 Louisiana Constitution and reenacted La. 15:572, had the effect of rendering La. C.Cr.P. art. 401(5) ambiguous. However, to reach that result one would have to ignore the basic rule for statutory construction that one presumes: by enacting new legislation, the legislature is aware of existing statutes and well-established principles of statutory construction. One presumes that the legislature acts with knowledge of the effect of its legislative acts and purpose.
Examining the matter beyond these basic, rules of statutory construction, in the Jacobs decision, the court held “that convicted felons, even those receiving first-offender pardons, are excluded from grand jury service.” Jacobs, 04-1219, p. 12, 904 So.2d at 91. The court in Jacobs quoted La. C.Cr.P. art. 401 A(5), providing that in order to qualify as a juror one must not be under indictment for. a felony nor have been convicted of a felony for which he has not been pardoned.
However, the defendant in Jacobs argued that La. C.Cr.P. art. 401 A(5) was unconstitutional on the ground that the right to serve as a juror was one of the rights guaranteed by La. Const. (1974) Art. I, § 20, which provides in pertinent part, that “[f[ull rights of citizenship shall be restored upon termination of state and federal supervision following conviction for any offense.” As the appellate court in Jacobs said: “Defendant argues that the right to serve on a jury is one of the restored rights contemplated by that constitutional provision, and that LSA-C.Cr.P. art. 401 A(5) is, therefore, unconstitutional.” Id., 04-1219, p. 12, 904 So.2d at 91.
But the court in Jacobs did not mention La. Const. (1974) Art. IV, § 5(E)(1) or La. R.S. 15:572, both providing for the first-offender pardon. The court held 197that the restoration of full rights of citizenship under La. Const. (1974) Art. I, § 20 “does not restore a convict’s right to sit on a jury.” Id., 04-1219, p. 12, 904 So.2d at 91, citing, inter alia, State v. Selmon, 343 So.2d 720 (La.1977). The court’s subsequent citing of State v. Adams, 355 So.2d 917, 922 (La.1978), for the proposition that “[o]nly basic rights such as the right to vote, work, or hold public office are restored,” referred to rights restored by operation of La. Const. (1974) Art. I, § 20.[12]
The defendant in Jacobs made no direct argument that one convicted of a felony for which he had received a first-offender pardon was qualified under La. C.Cr.P. art. 401 A(5) to serve as a juror. The court cited La. Const. (1974) Art. V, § 33(A), *289 providing that a citizen of Louisiana who has reached the age of majority is eligible to serve as a juror, also stating that “[t]he legislature may provide additional qualifications.” Jacobs, 04-1219, p. 13, 904 So.2d at 91. And the court held that the legislature was well within is constitutional authority in instituting the qualifications in La. C.Cr.P. art. 401. Nothing in Jacobs directly stands for the proposition that a first-offender pardon does not qualify a first-time felon to serve as a juror under La. C.Cr.P. art. 401 A(5).
The Supreme Court subsequently denied the defendant’s application for writ of certiorari and/or review. Jacobs, 05-2072 (La. 4/28/06), 927 So.2d 282. The court could have denied writs based on the correctness of the court of appeal’s holding in Jacobs, that the pardon requirement in La. C.Cr.P. art. 401 A(5) was not unconstitutional under La. Const. (1974) Art. I, § 20. Moreover, a writ denial is of no precedential value. Armstrong Airport Concessions v. K-Squared Restaurant, LLC, 15-0375, p. 8 (La.App. 4 Cir. 10/28/15), 178 So.3d 1094, 1100; Lake Air Capital II, LLC v. Perera, 15-0038, p. 7 (La.App. 4 Cir. 5/13/15), 172 So.3d 84, 88 (collecting cases); State v. Davis, 09-0438, p. 19 (La.App. 4 Cir. 1/13/10), 30 So.3d 201, 211.
In an unpublished decision, State v. Simms, 09-0977, unpub. (La.App. 1 Cir. 12/23/09), 2009 WL 5647221, the court held that the restoration of rights upon releasé from state or federal supervision under La. Const. (1974) Art., I, § 20, “does not restore a convicted felon’s right to sit on a jury.” Id., p. 5, citing the Supreme Court’s decisions in Selmon, supra, and Adams, supra. Simms did not mention the first-offender pardon.
La. Const. (1974) Art. I sets forth a “Declaration of Rights.” It includes such rights as the right to vote and hold public office; to a fair trial; to due process; to a preliminary examination; to keep and bear arms; of freedom of religion; of assembly and petition; of freedom of expression; et cetera. La. Const. (1974) Art. I contains no express right to serve on a jury, although La. Const. (1974) Art. I, § 24 does state that “[t]he enumeration in this constitution of certain rights shall not deny or disparage other rights retained by the individual citizens of the state.”
La. Const. (1974) Art. V, § 33(A) provides for the “qualifications” of jurors, and states: “A citizen of the state who has reached the age of majority is eligible to serve as a juror within the parish in which he is domiciled. The legislature may provide additional qualifications.” [Emphasis supplied.] Thus, the Louisiana Constitution does not expressly provide for a “right” to serve on a jury, but it does provide for the qualifications one must possess in order be “eligible” to serve on a jury.
In Selmon, the convicted felon-defendant argued that because his full rights of citizenship had been restored by La. Const. (1974) Art. I, § 20, the state was |99precluded from using his prior conviction to adjudicate him a habitual offender. In rejecting that argument, the Supreme Court examined the debates of the 1973 Constitutional Convention, giving rise to the 1974 Louisiana Constitution and its Article I, § 20. The Court stated that the debates revealed that the ultimate language chosen, ■ “rights of citizenship,” was adopted to make it clear that the drafters’ intent was “to restore the customary rights a citizen may exercise (the rights to vote, work, hold public office, etc.), and not to automatically erase the fact of the conviction.” Selmon, 343 So.2d at 722, The Court stated that the debates expressly discounted the notion that a former convict restored the rights of citizenship could not be prosecuted as a habitual offender in the *290 future or that the offender has been pardoned, only that “we’re going to give you back the minimum things that have been taken from you.” Id.
The Jacobs and Simms courts both cited Selmon for the proposition that the “right” to serve on a jury was not one of the rights of citizenship restored by operation of La. Const. (1974) Art. I, § 20. Both appellate courts also stated that only “basic rights such as the right to vote, work, or hold public office are restored.” Jacobs, 04-1219, p. 13, 904 So.2d at 91, Simms, 2009 WL 5647221, p. 5, citing Adams, 355 So.2d at 922.
Adams concerned a habitual offender sentence enhancement issue like Selmon, but the issue was expressly whether the first-offender pardon provided for by La. Const. (1974) Art. IV, § 5(E)(1) precluded adjudicating the first-offender a habitual offender. The Court noted that the “automatic pardon provision of Art. IV, § 5(E)(1) appears to have been adopted without debate” (by the drafters of the 1974 Louisiana Constitution). Adams, 355 So.2d at 922, n. 4. The Court noted that the effect that La. Const. (1974) Art. IV, § 5(E)(1) would have on the habitual | mnoffeflder law was reflected by the delegates’ discussion of La. Const. (1974) Art. I,. § 20 (as reflected by the Court’s analysis in Selmon). The Court in Adams merely concluded that the debate showed the intent not to have the fact of conviction erased by service of .the sentence — and, it necessarily follows, or by the “automatic” first-offender pardon provided for by La. Const. (1974) Art. IV, § 5(E)(1) and La. R.S. 15:572 B. As the Adams Court-succinctly put it: “If the legislature had intended that a first offense could not be relied upon for enhancement of punishment, it could easily have said so.” Id., 355 So.2d at 922.
The Court in Adams thoroughly discussed and distinguished the pardon by a governor from the first-offender pardon, stating that “[a] full pardon granted by the governor has presumably been given the careful consideration of several persons who have taken into account the circumstances surrounding the offense, and particular facts relating to the individual.” Id., 355 So.2d at 922. However, the Court also stated:
We recognize that there is a difference in the effect of a “pardon” under Art. 4, § 5(E)(1) and restoration of “full rights of citizenship” under Art. 1, § 20. Art. 1, § 20 restores only the basic rights of citizenship, such as the right to vote, work or hold public office. On the other hand, Art. 4, § 5(E)(1) restores privileges, as well as rights, such as the privilege of holding a liquor license.
Id., 355 So.2d at 922.
Thus, the Court in Adams recognized that a first-offender pardon, under La. Const. Art. (1974) IV, § 5(E)(1) restored more to a first-offender convicted felon than did La. Const. (1974) Art. I, § 20, which it recognized restored “only the basic rights of citizenship, such as the right to vote, work or hold public office.” See Adams, 355 So.2d at 922.
I mi In Adams, the Court referenced two of its prior decisions, State v. Childers, 197 La. 715, 2 So.2d 189 (1941) and State v. Lee, 171 La. 744, 132 So. 219 (1931), for the proposition that “[i]t is clear that a full complete pardon by the governor precludes the use of a pardoned offense to enhance punishment.” Adams, 355 So.2d at 921.
The Court reiterated the distinction- between a governor’s pardon and the first-offender pardon in Touchet v. Broussard, 10-0380 (La. 3/3/10), 31 So.3d 986. It considered whether the first-offender pardon provided by La. Const. (1974) Art. IV, *291 § 5(E)(1) entitled a convicted felon to run for public office under La. Const. (1974) Art. I, § 10(B)(1), which disqualifies from candidacy a person convicted in Louisiana of a felony or convicted under the laws of the United States of a crime which, if committed in Louisiana would be a felony, who “has not afterwards been pardoned either by the governor of this state or by the officer of the state, nation, government or country having such authority to pardon in the place where the person was convicted and sentenced.”- Despite the clear wording of La. Const. (1974) Art. I, § 10(B)(1) requiring a governor’s pardon, the defendant in Touchet argued that the first-offender pardon was a pardon that permitted him to run for office just as would a governor’s pardon. The Court rejected that argument, relying primarily upon its analysis in Adams. The Court noted, relying on its reasoning in Adams, that every appellate court which had considered the issue had held that an automatic first-offender pardon does not restore a convicted felon’s right to run for office under La. Const. (1974) Art. I, § 10(B). We note that the “rights” to vote and hold office are expressly provided for in Article I of the Louisiana Constitution, setting forth the “Declaration of Rights.”
| maHowever, dating at least as far back as a civil rights decision in 1950, the United States Supreme Court has referred to serving on a jury as a “right.” See Cassell v. Texas, 339 U.S. 282, 287, 70 S.Ct. 629, 94 L.Ed. 839 (1950)(language of 18 U.S.C.A. § 243, based on § 4 of the Civil Rights Act of 1875, “directs attention to the right to serve as a juror.”). In Malone v. Shyne, 06-2190 (La. 9/13/06), 937 So.2d 343, the Court held that the Louisiana governor has constitutional authority to issue a pardon restoring civil rights to a party convicted of a federal felony- — who has lost those civil rights under Louisiana law as a collateral consequence of that federal felony conviction — thus restoring the right to seek and hold a municipal or state office to one convicted of a federal felony. In its analysis, the Court quoted 39 Am.Jur. Pardon and Parole § 60 as follows: “The well-settled general rule is that a full pardon restores one to all his citizenship rights, including- the right to suffrage, to serve on■ a jury, and to-be a witness — ” [Emphasis supplied.]
The jurisprudence makes it clear that a first-offender pardon under La. Const. (1974) Art. IV, § 5(E)(1) and La. • R.S. 15:572 is something less than a governor’s pardon. La. R.S. 15:572 D states (and stated in 2009) that the offender receiving a first-offender pardon shall be issued “a certificate recognizing and proclaiming that the petitioner is fully pardoned for the offense, and that he has all rights of citizenship and franchise.”
A conclusion that a convicted felon with a first-offender pardon for that conviction was not qualified under La. C.Cr.P. art. 401 A(5) to serve on a jury in December 2009 requires mental gymnastics. In contrast, a straightforward common-sense statutory construction of the jüror qualification statute is that the legislature was aware of the 1966-enacted La. C.Cr.P. art. 401(5) (now article 401 A(5)) both when it added the first-offender pardon provisions to La. Const. (1921) Art. V, § 10 |1tHand La. R.S. 15:572 in 1968. Similarly, the dele1 gates to the 1974 Constitution Convention were obviously familiar with the issue when they passed the provision providing for submission to the voters of the 1974 Constitution, containing the first-offender pardon provision in Art. IV, § 5(E)(1). Also, the legislature was familiar with the provision of the 1974 Constitution when it amended and reenacted La. R.S. 15:572, with the first-offender pardon provision, to become effective with the 1974 Constitution.
*292 Between giving constitutional and statutory birth to the first-offender pardon in 1968 and the 2009 trial of the defendant, the legislature had over forty years in which to clarify, if it wished, the pardon provision of La. C.Cr.P. art. 401(5) (now article 401 A(5)). If the legislature had intended that a person with only one felony conviction for which he had received a first-offender pardon was not qualified to serve as a juror, it could have easily amended the one-sentence provision at some point between 1968 and the 2009 legislative session to add the three simple words it added to the end of that sentence by amendment in 2010 — “by the governor.” This simple act in 2010 made it clear that only those with felony convictions for which they had been pardoned “by the governor” were qualified to serve as jurors.
The Louisiana Supreme Court stated thirty-eight years ago in Adams, when rejecting the argument that a first-offender pardon restored the status of innocence to a party convicted of a first-offense felony for purposes of the Habitual Offender Law: “If the legislature had intended that a first offense could not be relied upon for enhancement of punishment, it could have easily said so.” Adams, 355 So.2d at 922. That reasoning is applicable to the present case as to the legislature’s intent as to La. C.Cr.P. art. 401(5) (now La. C.Cr.P. art. 401 A(5)).
11Q4A conclusion that a person was qualified to serve as a juror under La. C.Cr.P. art. 401 A(5), as in effect in 2009, if he had one felony conviction for which he had received a first-offender pardon, is not inconsistent with this court’s decision in Jones, supra; the Louisiana Supreme Court’s writ grant in the present case in State v. Wells, 09-2626 (La. 12/4/09), 23 So.3d 900; the Louisiana Fifth Circuit Court of Appeal’s decision in Jacobs; or the Louisiana Supreme Court’s writ denial in Jacobs.
In any case, however, the conclusion that a person convicted of a felony for which he received a first-offender pardon was eligible in December 2009 to serve as a juror is not dispositive of the correctness of the trial court’s removal of Juror Jackson in the present case, given that it was unclear whether he had a valid first-offender pardon.

Juror Magee

Juror Magee was selected and sworn as one of the twelve jurors selected to hear the case. On 15 December 2009, the trial court instructed the jury with the applicable law and sent it to deliberate. During deliberations, the trial court called counsel and Wells into chambers for a recorded conference concerning a question from a juror, which read:
Can a juror ask to be excused? Why because I know for a fact that a convicted felon is the only person who had her mind made up before deliberation? [Emphasis in original.]
The trial court inquired of the state whether it had conducted criminal record checks of all the prospective jurors when the convicted felon issue arose with Jurors Jackson and Cotton prior to the jury being sworn. The lead prosecutor did not directly answer the question, but asked that the state be allowed to check the l^records. The defense strongly objected to this matter being inquired into at that point in the trial.
The trial court called in the jury and informed it that the answer to the question of whether “a juror can be asked to be excused” was “no.” The trial court then instructed the jury on the duty to deliberate, repeated that instruction, and sent the jury back to deliberate.
*293 When the jury subsequently sent in a question concerning self-defense, and while all counsel and the defendant were in chambers, the state asked the court to remove Juror Magee, having determined that she had a 2006 felony conviction for looting from Jefferson Parish. The trial court inquired: “She did not indicate that on our juror questionnaire?” The prosecutor first indicated that he believed she did not fill that out/answer that particular question, but then stated that he believed she checked off “No.” The prosecutor, obviously having checked Juror Magee’s juror questionnaire, stated that he wished to put on the record that Juror Magee had checked off “No” in answer to question number 24 on her jury questionnaire, which asked: “Have you, your spouse/significant other, a family member, or a close friend ever been charged with a crime?” The state said: “So that means she is lying to the Court.”
The trial court called Juror Magee into chambers, where she admitted that she had a prior felony conviction for looting, for which she was sentenced to serve three years imprisonment, and which sentence she served at St. Gabriel. The trial judge advised Juror Magee that, as a convicted felon, she could not serve as a juror, and he was going to have to excuse her. Defense counsel asked Juror Magee if she was aware there was a question on the questionnaire about that, and she replied in the affirmative, but then said she had informed the “lady downstairs,” | ^apparently referring to a person with the Jury Commission with whom she had spoken in the jury pool lounge. She said she was told by a male there that it did not make a difference because it was not a serious crime. Juror Magee also said: “I gave him my statement saying that I was finished. I resolved — the paper and all that, you know.” Defense counsel immediately asked: “First offense?” Juror Magee replied in the affirmative, and the court asked her if she had “received one of those,” to which she replied in the affirmative — obviously referring to a first-offender pardon.
The trial court excused Juror Magee from the jury because she was a convicted felon, stating that its decision was based on its decision as to Juror Jackson and a decision by the “Supreme Court,” apparently referring to the Supreme Court’s writ grant reversing this court’s writ decision concerning the trial court’s removal of Juror Jackson. The trial court identified and introduced the rap sheet of Juror Ma-gee as an exhibit, and the court noted that Juror Magee had admitted she was a convicted felon. The trial court replaced Juror Magee with ,an alternate juror and instructed the jury that it had to begin deliberations anew.
The following day, 16 December 2009, in chambers, the defense presented Juror Magee’s personal appearance jury summons form on which she had answered “Yes” to the question of whether she had ever been convicted of a felony, to which was attached a Louisiana Department of Public Safety and Corrections, Division of Probation and Parole “Verification of First Offender Pardon,” dated 17 February 2009, from David Lindsey, identified as the District Administrator. The defense introduced the documents as an exhibit.
In further argument on the issue, it was noted that the state had filed into the record that date a memorandum in support of the trial court’s disqualification of | -i o?Juror Magee. At the request of the trial court, the state redacted the full name of Juror Magee from its memorandum and attachments, replacing it with her juror number, 100124347. Attached to the memorandum was her 21-page, 77-question juror questionnaire. In the memorandum, *294 the state argued that the trial court had held a hearing at which Juror Magee informed the court that she had been convicted of the felony offense and had served three years in prison. The state further noted that Juror Magee had previously indicated in the juror questionnaire that she had never been charged with a crime. The state then argued:
Based on this lie, the trial court judge disqualified [Juror; 100124347] as a juror and replaced her with an alternate juror.
The state detailed authority for the procedural issue involving the removal of a juror during deliberations and also cited the Supreme Court’s writ grant that reversed this court’s wit disposition as to the removal of Juror Jackson as authority. Finally, the state cited authority for the removal of a juror and replacement of that juror with an alternate based on a juror’s lack of candor. The state argued that Juror Magee had lied-on the jury questionnaire by answering “No” to the question regarding whether she had ever been charged with a crime, and concluded by arguing that, because disqualification of a juror for concerns about a juror’s lack of candor was proper, it followed that disqualification of a juror was proper for a deliberate lie.
We find, even if it "is assumed for the sake of argument that the trial court erred in removing Juror Magee on the sole ground that she was a convicted felon with only a first-offender pardon for that conviction, her removal did not constitute reversible error. This is because the trial court could have removed her from the jury because she misrepresented on her jury questionnaire that she had never been hogconvicted of a crime — and the state emphasized this reason at the time the court was determining whether she should be removed.
The last page of the juror questionnaire “completed” by the juror contains an unsigned oath reading as follows:
I declare under penalty of perjury that the information which I have provided in this juror questionnaire and any attachments are true and correct. I further declare that I have completed this questionnaire without anyone’s assistance.
Juror Magee did not sign the oath at end of the questionnaire. She did not fully complete the questionnaire, answering only the majority of the questions, including number 24, asking if, inter' alia, she had ever been charged with a crime. While it is true that upon questioning by the trial court Juror Magee admitted she had been convicted, she nevertheless answered untruthfully the juror questionnaire. It may be a coincidence that she did not sign the juror oath on the last page of the questionnaire — she failed to answer any question on the last four pages of the questionnaire. However, she also could have chosen not to sign the oath for fear of perjuring herself.
Nevertheless, in its memorandum filed on the day after Juror Magee was excused, the state cited multiple times that Juror Magee’s lack of candor or outright lie as to question number 24 warranted her removal from the jury, in addition to the first-offender pardon issue.
In State v. Derouselle, 97-2590 (La.App. 4 Cir. 10/20/99), 745 So.2d 767, this court reversed a defendant’s conviction for second degree murder on the ground that the trial court committed reversible error when it removed a juror on the second morning of trial because the trial court had thereby permitted the state to exercise a peremptory challenge after trial had commenced, in contravention of [1n9La. C.Cr.P. art. 795 B(l), and no showing that the juror was unable to perform or was dis *295 qualified from performing within the meaning of La. C.Cr.P. art. 789. The Supreme Court reversed this court in a per curiam opinion. See State v. Derouselle, 99-3283 (La. 4/28/00), 761 So.2d 1269.
It came to the attention of the court on the second morning of trial that the flaneé of the juror in Derouselle had had his parole revoked “on a charge of aggravated rape.” When the juror was asked by the court why she had not said anything about this when asked during voir dire by the state whether she, a family member, or close friend had been convicted or accused of a crime, she replied that she thought the question referred - only to her. The state sought to have her removed, saying it had struck all prospective jurors- who had admitted during voir dire that family members had been convicted of a crime. Although the prosecutor did -not allege a lack of impartiality or-bias, he-asked that the juror be excused because she had, in fact, heard him ask those questions and heard other jurors give affirmative responses to the question, mentioning- specific responses as to nieces, nephews, a brother, and an ex-husband. This court viewed the matter as the state being permitted to exercise a peremptory challenge in contravention of La. C.Cr.P. art. 796 B(l), which states that peremptory challenges “shall be exercised prior to the swearing of the jury panel.” This court noted that the trial court did not find that the juror was partial, biased, or should or could be excused for cause.
On application by the state for a writ of certiorari, the Supreme Court cited La. C.Cr.P. art. 789 as giving a trial court the discretion to replace a juror with an alternate upon finding that the juror has “become unable to perform or disqualified from performing” her duty. Derouselle, 99-3283, p. 1, 761 So.2d at 1270. The court noted that the trial court had expressed doubts about the candor and veracity |nnof the juror who had sworn an oath before submitting to voir dire examination. See La. C.Cr.P. art. 786 (“A prospective juror, before being examined, shall be sworn to answer truthfully questions asked him relative to his qualifications to serve as a juror in the case.”). The Court further noted that the juror, upon selection to the panel, had also sworn to “try the case in a just and impartial manner ... and to render a verdict according to the law and evidence[,]” citing and quoting La. La. C.Cr.P. art. 790. Derouselle, 99-3283, pp. 1-2, 761 So.2d at 1270. The Court concluded:
Under these circumstances, removing the juror (if not expressly disqualifying her) because of doubts raised by her lack of candor under oath about her competency to serve impartially, and replacing the juror with the alternate, represented the proper exercise of the trial court’s discretion. See State v. Fuller, 454 So.2d 119, 123 (La.1984).
Derouselle, 99-3283, pp. 1-2, 761 So.2d at 1270.
In the case at bar, the state made a point of putting on the record that Juror Magee checked off “No” to question number 24 when asked if she had ever been charged with a crime, characterizing her as lying. The trial court, however, did not mention this as a reason for removing her from the jury.
We find that the Court’s decision in Derouselle is authority for the proposition that the trial court could have removed Juror Magee and replaced her with an alternate without “expressly disqualifying her.” Id. Accordingly, because Juror Ma-gee was susceptible to removal for this reason, and the state effectively sought her removal at trial for this reason, in addition to the reason that she only had a first- *296 offender pardon, we do not find that the trial court erred in removing her.
Unimportantly, we note that the record fully supports the view that had Juror Magee answered question number 24 truthfully or accurately, she would have been challenged for cause by the state during the general voir dire just as it had challenged Jurors Jackson and Cotlon.
Finally, Wells fails to establish that he was prejudiced by Juror Magee’s replacement by an alternate juror accepted by the defense, even though it had an available peremptory challenge for selection of alternate jurors which was unused. While the defendant argues that where the trial court errs in granting a state challenge for cause, “the effect of which is the exercise by the state of more peremptory challenges than it is entitled to by law (La. C.Cr.P. art. 800(B),” it is reversible error, he cites no authority for that proposition. La. C.Cr.P. art. 800 B merely sets forth a hurdle which a defendant must overcome to raise the issue that the trial erred in granting a state challenge for cause. Wells cites no jurisprudence holding that in such a case, prejudice is presumed and the error constitutes reversible error per se.
Many decisions hold that prejudice is presumed and reversible error exits in a case in which a defense challenge for cause is erroneously denied, and the defendant ultimately exhausts his peremptory challenges. State v. Coleman, 14-0402, p. 48 (La.App. 4 Cir. 2/26/16),188 So.3d 174, 210; State v. Washington, 15-0819, p. 1 (La.App. 4 Cir. 2/17/16),187 So.3d 71, 73; see also Official Revision Comment (a) to La. C.Cr.P. art. 800 A (“The defendant need show only two things to obtain reversible error: (1) that the trial judge erred in refusing to sustain a challenge for cause by the defendant, and (2) that the defendant exhausted all his peremptory challenges.”).
Jjj2La. Const. (1974) Art. I, § 17(A) provides for jury trials in criminal cases and states in pertinent part: “The accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily.” Thus, the erroneous denial of a challenge for cause by a defendant and the exhaustion of his peremptory challenges is the infringement of a defendant’s constitutional right to challenge a juror peremptorily — the deprivation of one of his peremptory challenges, affecting substantial rights of the defendant. La. C.Cr.P. art. 921.
Unlike the guarantee of La. Const. (1974) Art. I, § 17(A), we note no explicit federal or Louisiana constitutional guarantee to a defendant that the state not be permitted more peremptory challenges than it is entitled to under Louisiana statutory law. Certainly, the obvious effect of the alleged erroneous removal of a prospective juror through the effective exercise by the state of more peremptory challenges than is allowed is one of equal treatment of the parties. Under certain circumstances, it could be substantially prejudicial to a defendant. Nevertheless, we find no authority for the proposition that such an error is per se presumptively prejudicial affecting “substantial rights” of a defendant to the extent that it constitutes reversible error.
As noted, the record supports the view that had Juror Magee truthfully or accurately answered question number 24 on her jury questionnaire about her criminal record, the state would have challenged her for cause during voir dire. Instead, the state accepted her as a juror. Juror Ma-gee’s felony conviction only came to light after one of her fellow jurors sent in a note to the court during deliberations advising the court of that fact (merely referring to an unnamed female juror). The state ascertained that the juror was Juror Magee. *297 She was replaced with an alternate juror who had been accepted by the defense, even though the |mdefense could have struck that alternate juror with an available alternate-peremptory challenge that appears to have gone unused.
Accordingly, even assuming- the trial court erred in removing Juror Magee, thus effectively giving the state more peremptory challenges than it was entitled to under the law, the record does not establish that the defendant’s substantial rights were prejudiced such that the error constitutes reversible error.

Timing of the Challenges to Jurors Jackson, Cotlon, and Magee

In Assignments of Error Nos. 5 and 7, relating to the trial court’s removal of Jurors Jackson, Cotlon, and Magee, Wells complains of the timing of the state’s challenges for cause of those jurors based on their prior convictions, an issue it raised as to all three jurors in the trial court. For the following reasons, we find the defendant fails to show that the trial court erred in rejecting the defense arguments on this issue.
As previously discussed, given that Wells was tried for first degree murder, a separate death-qualified venire was first selected over a period of several weeks. Afterward, general voir dire commenced. One panel was seated and voir dired, whereupon the parties began to exercise their challenges. The state challenged Juror Jackson for cause on the ground that he said he would hold the state to a higher burden knowing it was a death penalty case. The defense, however, disputed that characterization of Juror Jackson’s answers, saying that if the state proved its case beyond a reasonable doubt, Juror Jackson said he could vote guilty.
The trial court denied that challenge for cause as to Juror Jackson, whereupon the state said it had a bigger problem with Juror Jackson: that he was convicted of a felony for which he had not been pardoned. When defense counsel questioned why this issue had not been brought up previously, the prosecutor [1urepIied that counsel had been told that some issues would be dealt with in (general) voir dire. The trial court implicitly rejected the timing argument by the defense when it dismissed Juror Jackson. The defense said nothing more about- the convicted felon issue until the state challenged Juror Cot-lon on the same ground after a second panel was voir dired and challenges were being made. However, the trial court later held a hearing as to whether Juror Jackson had a first offender pardon; the court questioned Juror Cotlon as to his court-martial; and the defense took separate writ applications as to the trial court’s removal of those jurors.
' Wells cites no statutory restrictions in his argument that the state’s alleged “unexplained delay” in bringing forth the jurors’ felony convictions violated his constitutional right to intelligently use peremptory challenges, his right to due process, and his right to a fair and impartial jury. While he complains that the state “waited until the parties were already exercising peremptory challenges to launch its campaign to disqualify jurors with first-offender pardons,” he cites no provision of the Louisiana Code of Criminal Procedure violated by neither the timing of the state’s challenges or violations of any other statutory authority.
While the defendant argues at length that the state has access to jurors’ criminal records that the defense does not, the state counters that the jury questionnaires were designed to ascertain that fact and suggests that defense counsel could have asked members during general voir dire if they had any felony convictions. As - to Juror Magee, the state concedes that it *298 apparently failed to discover that she had a felony conviction from another parish. But, as previously discussed, it was not until an unidentified fellow juror sent a note to the trial judge during deliberations, that the state sought to remove Juror Magee from the jury. I'^Neither the record, nor logic, supports the view that the state intentionally withheld information of Juror Magee’s felony conviction.
Wells argues: “The-trial court erred in denying Mr. Wells’ motions for a mistrial.” However, Wells’ citation to a page in the record does not discuss a mistrial. Rather, the page is a reference to the defendant’s motion for new trial in which he argued that the trial court “should have declared a mistrial” if it insisted on removing Juror Magee.- It is true that at one point in objecting to and arguing against the removal of Juror Magee the defendant said: “No way. No way. Then you have a mistrial on your hands.” However, Wells did not formally move for a mistrial s& that time, and fails to cite a point in the record where he did so relative to the removal of Juror Magee.
The defendant cites State v. Carmouche, 141 La. 325, 329, 75 So. 68, 69 (1917), for the proposition that if a juror is disqualified and removed from the panel for any cause after commencement of the trial with the drawing of another juror is, in effect, the entering of a mistrial. However, we find no merit to this case from 1917. La. C.Cr.P. art. 789 A (existing paragraph, from 1966 enactment designated as Paragraph A by La. Acts 1995, No. 364 and La. Acts 1995, No. 1273) states, in pertinent part, that: “Alternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing their duties.” La. C.Cr.P. art, 789 C (added by La. Acts 1995, No. 364 and La. Acts 1995, No. 1273) states that: “If the court, as provided in Paragraph A, replaces a principal juror with an alternate juror after deliberations have begun, the court shall order'the jury to begin deliberations anew.” Thus, the Louisiana Code of Criminal Procedure contemplates what procedurally occurred in the |116present case. To the extent that the Carmouche decision is in conflict with La. C.Cr.P. art. 789 on this issue, it has obviously been legislatively overruled.
Wells points to an argument by defense counsel at trial that the jury selection left the defense in the position “to not use our 12th preemptory [sic] challenge,” asserting that the right to do so was “denied by withholding the criminal convictions from both the Court and the Defense and sandbagging us at the last minute.” Defense counsel continued to argue that the defense was left with a couple of jurors at the end, and it was not in a position to exercise all of its peremptory challenges, thus violating the defendant’s right to a “fair picking of a jury.”
Louisiana Const. (1974) Art. I, § 17 guarantees to a defendant the right to full voir dire examination of prospective jurors and the right to challenge jurors peremptorily, However, the defendant neither articulates precisely how he was prejudiced, nor how the removal of any of the three jurors impacted his right to use his twelfth peremptory challenge.[13]
*299 We find no abuse of discretion by the trial court when it excused Jurors Jackson, Cotlon, and Magee over defense objections as outlined above. We conclude and find no merit to any aspect of any of the assignments of error defendant labeled as Assignments of Error Nos. 1 through 7, relating to the removal of Jurors Jackson, Cotlon, and Magee.
ASSIGNMENTS OF ERRORS NOS. 8 AND 9
[mIn Assignments of Error Nos. 8 and 9, Wells argues that the trial court erred in excluding for cause Juror Duffin and Juror Beasley, during the death-penalty qualification (or Witherspoon) voir dire, for what the defendant characterizes was their “general concerns” about the death penalty/capital punishment. The basis of his argument is Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968),[14] as clarified in Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)(“We therefore take this opportunity to clarify our decision in With-erspoon, and to reaffirm the above-quoted standard from Adams [v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) ] as the proper standard for determining when a prospective juror may be excluded for cause. because of his or her views on capital punishment.”)[15]
However, a defendant tried for a capital offense who does not receive the death penalty does not have a valid With-erspoon complaint. State v. Edwards, 406 So.2d 1331, 1346 (La.1981) |1ia(‘‘This defendant did not receive the death sentence and this court has consistently held that a defendant who does not receive the death penalty has no valid Witherspoon com
plaint.”); State v. Huckabay, 00-1082, p. 21 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1105 (“The defendant did not receive the death penalty. Accordingly, he cannot raise this claim.”); State v. Plaisance, 00-1858, p. 18 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1187 (defendant tried for first degree murder; convicted of second degree murder; sentenced to life imprisonment at hard labor without benefits). These decisions derive from the U.S. Supreme Court’s decision in Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 *300 L.Ed.2d 797 (1968), wherein the Court stated:
In Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been excluded for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. Our decision in Witherspoon does not govern the present case, because here the jury recommended a sentence of life imprisonment. The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant’s guilt, and that his conviction must accordingly be reversed because of the denial of his right under the Sixth and Fourteenth Amendments to trial by an impartial jury. We cannot accept that contention in the present case. The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily ‘prosecution prone,’ and the materials referred to in his brief are no more substantial than those brought to our attention in Witherspoon. Accordingly, we decline to reverse the judgment of conviction upon this basis. [Footnotes omitted.]
Bumper, 391 U.S. at 545, 88 S.Ct. 1788.
Iiiflln attempting to overcome the well-settled jurisprudence that a defendant tried for a capital offense who does not receive the death penalty has no valid Witherspoon complaint, Wells contends that he “did not argue in these assignments of error that the death-qualification process led to a prosecution-prone jury.” He is correct on this point.
However, the defendant misconstrues Bumper. Bumper recognizes the obvious— that a juror removed from a capital case for his views on capital punishment would not have been removed but for those views on capital punishment. Thus, when a jury selected pursuant to Witherspoon recommends a sentence of life imprisonment instead of a sentence of death, a defendant’s rights insofar as having a fair-death qualified jury has effectively been mooted. While Bumper alludes to the possibility that a defendant in such a case may still establish that he is entitled to relief if he can meet the obviously very high burden of proving that the death-qualified jury in his case “was necessarily prosecution-prone,” Wells has expressly claims that he has not argued that the death-qualified jury chosen in the present case was “prosecution prone.”[16]
In his original appellate argument, Wells argues that the trial court erred in excluding Jurors Duffin and Beasley based on their views on the death penalty/ capital punishment. The entire thrust of his argument is that the death-penalty voir dire of neither Juror Duffin nor Juror Beasley furnished a sufficient basis for the trial court to conclude that neither would consider the death penalty should the defendant be convicted of first degree murder. This was also the implicit basis of 112ndefense counsel’s objections to the trial court’s excusing of the two jurors, which excusáis were based on the fact that the court did not believe that either juror could follow the court’s instruction and the *301 law and consider imposing a sentence of death.
The defendant subsequently modifies his argument, stating that: “Mr. Wells relied upon long-settled Louisiana jurisprudence holding that improper grants of cause challenges may require reversal where the State effectively exercises more peremptory challenges than allowed by law.” He cites for this proposition, this court’s decision in State v. Miller, 14-0406 (La.App. 4 Cir. 2/25/15), 160 So.3d 1069. However, Miller did not involve a death-penalty qualified jury. In Miller, we merely cited the plain language of La. C.Cr.P. art. 800 B, providing that the erroneous allowance to the state of a challenge for cause does not afford a defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law.
La. C.Cr.P. art. 800 B merely sets forth a bar that must be met in order for a defendant to complain of a trial court’s alleged erroneous granting of a challenge for cause by the state. It has no application to the present case, where the defendant was neither sentenced to death nor convicted of a crime for which he could have been sentenced to death.
No merit exists ■ to these two assignments of error.
ASSIGNMENTS OF ERROR NOS. 10 AND 11
In Assignments of Error Nos. 10 and 11, the defendant argues that the trial court erred in denying his challenges for cause of Jurors Kolenovsky and Bizal. He claims Juror Kolenovsky unequivocally favored the testimony of police | ^officers, and Juror Bizal said she would consider a defendant’s failure to testify (the exercise of his Fifth Amendment rights) in deciding if he was guilty.
La. C.Cr.P. art. 800 A, concerning objections to challenges for cause, states:
A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection.
Prior to amendment by La. Acts 1983, No. 181, La. C.Cr.P. art. 800, what is now designated at Paragraph A, required that a defendant exhaust his peremptory challenges before the completion of the panel in order to complain of a ruling refusing to sustain a challenge for cause made by him. In the present case, Wells had one peremptory challenge left after the jury and alternates were selected.
However, under present La. C.Cr.P. art. 800 A, a defendant may complain of a ruling denying his challenge for cause even if he does not exhaust all his peremptory challenges. But, “in such a case, the defendant must be able to show some prejudice in order to overcome the requirement of La. C.Cr.P. art. 921 that ‘[a] judgment or ruling shall not be reversed by an appellate court because of any error ... which does not affect substantial rights of the accused.’” State v. Robertson, 92-2660 (La. 1/14/94), 630 So.2d 1278, 1280. Thus, unlike where the trial court errs in denying a defendant’s challenge for cause and the defendant exhausts his peremptory challenges, in which prejudice is presumed (and the error therefore constitutes reversible error), when a defendant does not exhaust all of his peremptory challenges, he must show prejudice as per La. C.Cr.P. art. 921 in order to establish reversible error.
Wells also argues that this court should not require a defendant to exhaust his peremptory challenges in order to trigger *302 the presumption of prejudice, because liggthe state undermined its ability to exhaust its challenges by delaying its challenges to the qualifications of jurors with first-offender pardons. This issue was addressed previously in our discussion of Assignments of Error Nos. 1 through 7, addressing the issue of the trial court’s excusing of Jurors Jackson, Cotton, and Magee. We find no merit to the argument that this court should presume prejudice should it find that the trial court erred in denying the defendant’s challenges for cause as to Jurors Kolenovsky and/or Biza!,
It is a challenge for cause under La. C.Cr.P. art.' 797 (2) and (4) that: “(2) [t]he juror is' not impartial, whatever the cause of his partiality,” or “(4) [t]he juror will not accept the law as given to him by the court.”
A prospective juror’s responses during voir dire cannot be considered in isolation, and a challenge for cause should be granted even when a prospective juror declares his or her ability to remain impartial. This is true if the juror’s responses as a whole reveal facts from which bias, prejudice, or an inability to render a judgment according to law may be reasonably inferred. State v. Mickelson, 12-2539, p. 13 (La. 9/3/14), 149 So.3d 178, 187, citing State v. Frost, 97-1771, p. 4 (La. 12/1/98), 727 So.2d 417, 423.
In Mickelson, the Court "recognized that “the line-drawing required of trial courts faced with challenges for cause of prospective jurors who give equivocal or contradictory responses during voir dire is complicated and oftentimes daunting.” Id., 12-2539, p. 12, 149 So.3d at 186. Thus, the Court reiterated the well-settled principle that an appellate court should accord great deference to a trial court’s ruling on a challenge for cause, “which is necessarily based, in part, on the court’s personal observations during, questioning.” Id., 12-2539, p. 12, 149 So.3d at 186-87. Therefore, a trial court is vested with broad discretion in ruling on challenges 1123for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. Id., 12-2539, pp. 12-13, 149 So.3d at 187.

Juror Kolenovsky

Wells challenged Juror Kolenov-sky for cause at the conclusion of the death-penalty voir dire, based on her allegedly giving more credibility to police officer witnesses than non-police officer witnesses, The trial court denied the challenge for cause, and the defense peremptorily struck the juror during the general voir dire. We do not find that the trial court abused its discretion in denying this challenge for cause.
Juror Kolenovsky confirmed during voir dire by the state that she had raised her hand when the witness list was being read; she explained that she believed she knew a police officer on that list. She elaborated that she was a clinical psychologist with the LSU School of Medicine, and she did some work with police officers. She said “we,” apparently meaning herself and clinical psychologists at LSU, worked with the officers on understanding how violence impacts children and also provided “some support to them.” She confirmed that she had an ongoing relationship with the police department as a psychologist, and stated that she covered the NOPD’s Second Police District and was available to assist officers in crisis. She believed that she recognized an officer’s name on the witness list as being/having been assigned to the Second District at some point.
Juror Kolenovsky replied “No” when asked whether this would affect her ability to judge police officer testimony as she *303 would the testimony of any other witness. When asked whether she had any personal relationship with any of the |ia4police officers, she replied: “None:of the officers you listed that you read out the names.”
During voir dire by the defense, Juror Kolenovsky was asked about her responses in the jury questionnaire where, according to defense counsel, when asked whether there were certain law enforcement officials to whom “you give greater credibility,” she had written that she thought she would with respect to police officers. She elaborated on that questionnaire answer, explaining that she worked with a wide variety of police officers, some of whom she felt “are very credible,” “some that take the job very seriously and work very hard; and there are others not so much.” She confirmed that she wrote on the jury questionnaire .-that in general she gives NOPD more credibility “unless there is some benefit to them to be untruthful.”
Defense counsel noted that the defense was going to prove that certain police officers were not telling the truth, and told Juror Kolenovsky that the problem was that she was “going to start off with an inclination to believe the police officer before you hear anything. That’s what you told us.” Juror Kolenovsky replied:
In general, yes. In general, I would hope'that the police officer is telling the truth. That would be true, but I would listen to the testimony and see what they have to say and evaluate on my own whether I feel that they are being truthful in this ca§e or not.
Juror Kolenovsky elaborated that she believed a police officer was “[mjore credible in certain areas.” When defense counsel asked if she meant the “area he’s going to testify about,” she replied: “Hopefully.” However, she later stated that she tended “to evaluate people based on what they’re saying and how they’re reacting and how they’re answering the questions and how they respond to things. |]2SIf a police officer get [sic] hostile on the stand and I listen to him and I don’t feel very confident in what he’s saying or how he’s answering the questions, I might view him as not very credible.” She said she believed that, in general “what’s the benefit to them of coming to this trial and lying which is going to put them at great risk and peril.”
When defense .counsel informed Juror Kolenovsky that she had “no right under the law to deem them more credible,” and “that is what, his Honor will tell you,” Juror Kolenovsky replied: “Okay.” Defense counsel then told her that his problem was her coming to the table “crediting them when you have no right to do so. Am I right?” Juror Kolenovsky replied: “If that’s the law, we look at everybody as they come.” When defense counsel asked her whether she would want the defense to prove that a police officer is lying or not lying, she replied: “No. I think that the State has to prove that anybody who gets up on the stand is giving factual evidence. The best that they can.... I feel it’s their job to look at that testimony to help the jury understand if this is accurate testimony, If we should, put weight behind the testimony.”
Juror Kolenovsky twiee replied “Yes” when asked during, follow-up voir dire by the state whether she would: (1) be able to “evaluate and scrutinize” a police officer’s testimony “as with any other lay witness;” and (2) “be able to judge their testimony the same way you would judge any other witnesses?” When the prosecutor asked her whether, if the judge instructed that was what she,needed to do, she would be able to follow that instruction, the juror replied:
I would like to do that with any witness. Regardless of whether they’re a doctor or police officer. I would like to *304 think I would be able to judge their testimony based on what they say and how they present.
112fiThe defense and state argued this issue. The trial court found that she “can follow the Court’s instructions and comply with her oath as a juror.”
The voir dire of Juror Kolenovsky as a whole fairly revealed that she could follow the trial court’s instructions and follow the law, despite her professional work with New Orleans police officers. The voir dire reflects that her views on the issue of judging the credibility of police officers as any other witness were illuminated during the voir diré process; she would have no problem complying with the trial court’s instructions and her oath as a juror, and she could judge the credibility of all witnesses based on their demeanor and testimony. As defense counsel said of Juror Kolenovsky: “Nice lady, smart.” The voir dire reflects that Juror Kolenovsky was a highly-educated, thoughtful individual who was aware of her duty and responsibility as'a juror in the case.
Moreover, even assuming the trial court erred in failing to grant Wells’ challenge for cause as to Juror Kolenovsky, the defense peremptorily struck her during the general voir dire and, as noted, at the conclusion of voir dire the defense still had one peremptory challenge remaining. The defendant thus fails to show how he was substantially prejudiced such that the error would call for reversal of his conviction and sentence.
Juror Bizal'
Wells argues that the trial court erred in denying his challenge for cause of Juror Bizal as to her views on a defendant not testifying in his own behalf. The defendant initially challenged Juror Bizal at the conclusion of her death-penalty voir dire on three grounds, including, according to the defense, that she would hold it against the defendant if he did not testify. However, the trial court stated that it would entertain the challenge to Juror Bizal at the general voir dire. After the 1127general voir dire, during which no further questions were addressed to Juror Bizal on the issue, the defense reurged a challenge of Juror Bizalfor cause as to her views on a defendant failing to testify in his defense and her views on the burden of proof. The trial court denied the challenge for cause, and the defense peremptorily struck Juror Bizal.
On appeal, Wells only argues that the trial court erred in denying the challenge for cause as to the issue of Juror Bizal’s views on a defendant’s failure to testify.
Juror Bizal mentioned nothing about a defendant’s • failure to testify during her voir dire by the trial court or by the state. That issue first arose during voir dire by the defense, when Juror Bizal was asked about the views she expressed on her juror questionnaire concerning a defendant who does not testify in his own behalf. She said she would “wonder why someone wouldn’t want to do that, especially if they knew that they were not guilty.” She said she agreed “[t]o some extent” with the statement that “if a defendant doesn’t testify in his own behalf he’s more likely guilty.” She elaborated one question later that “I would tend to lean more in that direction. But once again, I don’t know enough information. It’s just on the surface.”
The defense informed Juror Bizal that was not supposed to be a factor in adjudicating guilt. Juror Bizal replied: “Well, if it’s been explained to me that I have to put that aside, then I put that aside.” Asked whether she could do that even though she would agree “that would be an indicia of guilt,” Juror Bizal, noting that she had never been a juror, stated that she did not *305 understand everything “that goes into it, if that’s explained to me, I would just have to forget that.” That was the last question defense counsel asked of Juror Bizal on this issue.
liggAs previously noted, at the conclusion of the death-penalty voir dire, the defendant challenged Juror Bizal for cause on three grounds, including, that she would hold it against Wells if he did not testify. The trial court stated that it would entertain the challenge to Juror Bizal at the general voir dire. After the general voir dire, during which no further questions were addressed to Juror Bizal concerning the issue, defense counsel reurged a challenge for cause as to the issue of her views on a defendant fading to testify in his defense (and also as to her views on ‘the burden of proof). The trial court denied the challenge for cause without specifying any reasons, and the defense peremptorily struck Juror Bizal.
We do not find that the trial court abused its discretion in concluding that Juror Bizal’s responses as a whole indicated that she could follow the court’s instructions, comply with her oath as a juror, and put considerations of the defendant’s failure to testify out of her mind when determining guilt or innocence.[17]
We find no merit to either of Wells’ Assignments of Error Nos. 10 and 11.
ASSIGNMENTS OF ERROR NOS. 12 AND 13
The defendant’s Assignments of Error Nos. 12 and 13 concern the admission into evidence, and the playing of, telephone calls Wells made from jail between his March 2009 trial (in which a mistrial was declared) and his December 2009 trial.
Wells first argues that the jail telephone calls should have been excluded because the state obtained them illegally through subpoenas duces tecum issued in accordance with La. C.Cr.P. art. 66 — a fact recognized by this court in its writ decision in State v. Wells, 09-1602, unpub. (La.App. 4 Cir. 11/25/09). However, |1g3as acknowledged by the defendant, in the writ application seeking relief from a trial court judgment denying his motion to exclude the jail house CD recordings, this court expressly denied the defendant relief, finding that the trial court did not abusé its discretion “in refusing to exclude the evidence.” Wells, 09-1602, p. 3.
Wells also acknowledges that. subsequently, after this court denied the state’s writ application denying its motion to introduce a recording in which the defendant referred to a tattoo on his head of the term “assassin,” the Louisiana Supreme Court granted the state’s application for supervisory and/or remedial writs. See State v. Wells, 09-2595 (La. 12/2/2009), 24 So.3d 852 (“Writ Granted. The ruling of the trial court is reversed. The contents of the recording are relevant and admissible.”).
Finally, the defendant acknowledges that' on 9 December 2009, during the presentation of its case-in-chief, the state sought to introduce recorded jail phone calls it previously stated that it did not intend to introduce until rebuttal, to impeach the defendant’s expected testimony. The state represented in a 19 October 2009 pleading that it only intended to introduce one recording during its case-in-chief, the one where Wells referred to the “assassin” tattoo on his head. During the state’s re-redirect examination of Don Hancock, telephone supervisor for the Orleans Parish Criminal Sheriffs Office, the state stated: “I want to show you what I’m marking as state’s exhibit 109[,]” whereupon defense counsel asked to approach the bench. The matter was deferred, and argument on the *306 issue was had on 10 and 11 December 2009.
On 11 December 2009, the trial court effectively ruled that the state could only play the recordings at issue on rebuttal for impeachment purposes. The state sought supervisory review, arid we granted the state’s writ application. State v. Wells, 09-1676, unpub. (La.App. 4 Cir. 12/11/09)(“The trial court abused discretion by denying the admissibility of relevant evidencé.”). Wells subsequently sought supervisory and/or remedial writs in the Supreme Court, which denied relief. State v. Wells, 09-2712 (La. 12/13/09), 23 So.3d 925 (“Denied”).
On 13 December 2009, the state recalled Mr. Hancock and played the contested recordings.
Wells’ appeal of these matters is squarely covered by application of the law-of-the-case-doctrine, previously discussed with respect to prospective Juror Jackson’s removal for cause. No new evidence was introduced' with respect to these matters, and the defendant had a full opportunity to litigate all issues involving the admission of these jail telephone calls during the state’s case-in-chief.
Further, the defendant complains that the state used the calls in its case-in-chief to “preemptively call into question defendant’s credibility and character,” “infringing upon his constitutional right to testify in his own defense.” However, the timing of the state’s playing of the recordings actually benefitted the defendant; he was able to “explain” the calls during his testimony in substantial detail. Further, the state has the discretion to determine the order of the presentation of its eviderice in a case.
Approximately ten percent of Wells’ direct examination testimony was devoted to questions concerning the jail telephone calls. Had the state played the calls in rebuttal, as it apparently had intended to do, the defendant would have had no opportunity to rebut that evidence. When asked at the conclusion of defense counsel’s extensive questioning on the issue: “As you sit here before this jury, can you accept every word on those tapes?,” the defendant replied: “Yeah.”
|iaiIn addition, it was the defense’s position that the telephone calls “captured expressions of [the defendant’s] relief and excitement that he had finally been able to tell his side of the story and that he had not been convicted of a crime which he did not commit.” Reading the transcripts of the calls leads one to conclude that such would not be an implausible characterization of the calls. We find no merit to the defendant’s argument that this “plausible position had already been gutted at trial because the State successfully undercut Mr. Well’s character and credibility before he took the stand.”
The calls were going to be played for the jury, and Wells fails to show that he was prejudiced by the timing of the presentation of this evidence.
Under these circumstances, we apply the law-of-the-case-doctrine, thus barring reconsideration of these claims.
ASSIGNMENT OF ERROR NO. 14
In his fourteenth assignment of error, the defendant complains of “ongoing pros-ecutorial misconduct” that “infected the proceedings and deprived [the defendant] of due process and a fair trial.” However, this is primarily a regurgitation of claims already discussed and found to be without merit and/or covered by the law-of-the-case doctrine — claims as to the state’s abuse of the subpoena duces tecum power “to gather, evidence (phone call recordings) illegally;” its “late disclosure” of its intent to introduce the phone recordings in its *307 case-in chief; and its alleged “late disclosure and non-disclosure of prospective and seated jurors’ felony convictions.” Wells asserts: “This misconduct was at the heart of several of the serious constitutional violates [sic] alleged in this brief, and independently and cumulatively warrants relief.”
| iaaIt is well-settled that the cumulative effect of alleged errors complained of by a defendant on appeal, none of which constitutes reversible error individually, neither warrants reversal of a conviction or sentence, nor does it deprive a defendant of his right to a fair trial. State v. Williams, 13-0283, p. 35 (La.App. 4 Cir. 4/23/14), 137 So.3d 832, 858, citing State v. Draughn, 05-1825, p. 70 (La. 1/17/07), 950 So.2d 583, 629.
The defendant also complains of the state’s “blatant violation of a court order in an effort to shave the defendant’s head to expose his tattoo.” This involved the state obtaining a search warrant from a magistrate judge to have Wells’ head shaved to expose a tattoo of the word “assassin.” The defense learned of this search warrant and filed a motion to quash it, which the trial court granted during a hearing on 6 November 2009. The state sought supervisory review in this court, and this court denied relief. State v. Wells, 09-1440 (La.App. 4 Cir. 10/23/09)(‘Writ Denied”). The Supreme Court subsequently denied the state’s application for supervisory and/or remedial writs. State v. Wells, 09-2324 (La. 10/26/09), 21 So.3d 268 (“Denied”).
The state presented a witness in its case-in-chief, a former Assistant District Attorney, who testified that she had previously seen Wells in court with a shaved head and a tattoo thereon which read “assassin.” The defendant presented in his defense a witness, a fellow inmate, who had tattooed the word “assassin” on Wells’ head. Wells testified as to the tattoo on his head of the word “assassin.” He fails to show how the state’s action in securing the search warrant from a magistrate judge affected his substantial rights such that he is thereby entitled to the reversal of his conviction and sentence.
1 íasWells further complains of the lead prosecutor’s alleged “repeated disrespect to the trial court” and “disorderly conduct throughout the proceedings,” which admittedly resulted in direct contempt findings against the particular prosecutor. However, he fails to establish that his substantial rights were affected by these actions by the prosecutor such that he is thereby entitled to the reversal of his conviction and sentence.
No merit exists in this assignment of error.
ASSIGNMENT OF ERROR NO. 18
Wells’ final assignment of error is that the mandatory sentence imposed on him for his conviction of second degree murder, life imprisonment at hard labor without the benefit of parole (probation, or suspension of sentence), violates the U.S. Constitution’s Eighth Amendment prohibition against “cruel and unusual punishment.”
The record neither contains a written motion to reconsider sentence, nor do we note any indication that an oral motion to reconsider sentence or oral objection to the sentence was made. Thus, the defendant is precluded from raising the constitutional excessiveness of his sentence on appeal.[18]
*308 11¡MWe find no merit to this assignment of error.
CONCLUSION
For the foregoing reasons, the conviction and sentence of Tyrone Wells is affirmed.
AFFIRMED.
LANDRIEU, J., CONCURS IN THE RESULT

. Henceforth, when we reference, an exhibit, such exhibit was received in evidence.

. The transcripts of the testimony of Dr. Aruni Akundi and Ameka Cheetum from defendant’s first trial are technically not part of the record on appeal. They are only attached to the defendant’s original brief on appeal. Wells’ 24 June 2015 e-filed Motion to Supplement the Record expressly referred to these two exhibits as something the record was lacking, but no indication exists that the record was ever formally supplemented with them. We note that the defendant does not request in his appellate brief that the record be supplemented with the exhibits attached to that brief. We further note that the state takes no issue with respect to these attachments to defendant's brief. In the interest of justice, we consider them herein because they were obviously read at trial and heard by the jury; the state has not protested by asking that they be stricken as exhibits to Wells' brief; that although technically an error, such consideration is also per se harmless in the context of this case; and that by considering them, we preclude a potential future post-conviction attack on our result herein for counsel's failure to request that the record be supplemented with copies.

. The testimony by Mr. Gamble was part of a proffe.r by the defense. The trial court disallowed the introduction of the medical records that were in question. The defendant raises no issue on appeal about the medical records and we are precluded from considering them, mentioning only that Mr. Gamble testified for *262 completeness of what the record on appeal contains.
. Cameron Gamble, an attorney, testified that he represented Kimberly Vazquez, the widow of Jose, in connection with claims against the estate of the deceased victim and against the “trustee” in succession. He identified the trustee as Mr. Vazquez, or “Pepe,” as he.was known. Mr. Gamble confirmed that during the litigation in the case he obtained records of one or two life insurance policies on Jose issued by New York Life. He could not recall whether any medical records on Jose were in those records. He never shared the records from New York Life with any other parties or attorneys involved in the case except to the extent he disclosed that the life insurance applications and policies to the attorney for another .petitioner, Leticia Rodriguez. Mr. Gamble confirmed that Leticia Rodriguez was the mother of the deceased’s illegitimate child. Mr, Gamble testified that he had never reviewed or seen the medical records labeled by the defense as an exhibit. He further stated that no medical records were discussed with Kimberly Vazquez during the litigation, or with any other party to the litigation. He confirmed that there was never any discussion with Kimberly concerning her waiver of any marital privilege she had as to Jose's medical records.
Mr. Gamble confirmed that defense counsel then examining him had subpoenaed the New York Life records. He spoke to Kimberly about the subpoena, telling her he did not want to turn over the records without her consent. She did not authorize him to release the records, but told him she would talk to the District Attorney and get back with him. Mr. Gamble stated that he did not respond to the subpoena, but instead filed a motion to strike with the court. The court in turn ordered him to .turn over the records to the court, which he did — before Kimberly got back to him. He did not recall discussing with Kimberly that he had done so. Mr. Gamble replied in the negative when asked on cross examination by the state whether Kimberly ever waived any privilege with regard to her husband’s medical records.

. We note that, while Dr. Traylor had confirmed on recross examination that he had conducted hundreds of autopsies on individuals who died after unsuccessful trauma surgery in which the diagnosis (what the trauma surgeon said occurred) differed from his own ultimate conclusion(s), he then testified on re-redirect examination that he believed the physician who laid eyes on the trauma patient and performed surgery on the patient would be the best one to evaluate the patient, and "[tjhat’s who I'd want to ask” what caused a particular injury.

. Defense counsel Fawer stated: ‘‘[W]e have 57, maybe a few less.”

. Article 134 states:
Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court.

. MCM (2008) Pt. IV, § -4.a (a), Art. 80, states:
(a) An act, done with specific intent to commit an offense under this chapter, amounting to more than mere preparation and tending, even though failing, to effect its commission, is' an attempt to commit that offense.
La. R.S 14:27 A and B state:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

. Defense counsel Fawer stated: "[T]hey wait until now to bring it up. I think it’s just not fair.”

. Art. V, § 10 of the Louisiana Constitution of 1921 read:
The Governor shall have power to grant reprieves for all offenses against the State; and may, except in cases of impeachment, *285 or treason, upon the recommendation in writing of the Lieutenant Governor, Attorney General, and presiding judge of the court before which the conviction was had, or any two of them, grant pardons, commute sentences, and remit fines and forfeitures. In case of treason he may grant reprieves until the end of the next session of the Legislature,, in which body the power of pardoning is vested.

. As enacted in 1928, La. R.S. 15:572 read:
The governor shall have power to grant reprieves for all offenses against the state; and may, except in cases of impeachment, or treason, upon the recommendation in writing of the lieutenant-governor, attorney-general, and presiding judge of the court before which the conviction was had, or any two of them, grant pardons, commute sentences, and remit fines and forfeitures after conviction. In case of treason he may grant reprieves until the' end of the next session of the Legislature, in which'body the power of pardoning is vested.

. La. Const, (1974) Art. IV, § 5(E)(1) was amended twice in 1999 to its current text, adding, as to the requirement for a governor’s pardon, commutation, et cetera, that the recommendation by the Board of Pardons be “favorable,” and qualifying the first-offender pardon as only for those convicted of a "nonviolent crime, or convicted of” certain enumerated crimes. See, respectively, La. Acts 1999, No. 1401; La. Acts 1999, No. 1398.

. See discussion of Adams, supra.

. Counsel stated: “[W]hat would be fair, your 'Honor, is to afford us, ‘us’ being the defense attorney, two additional preemptory [sic] challenges under these circumstances and it’s my application that we [sic] afforded them.” We note that while Wells argues here that the timing of the state's challenges of Jurors Jackson and Cotlon for cause deprived him of his right to use his twelfth peremptory challenge, at one point defense counsel argued that the court should grant the defense two additional peremptory challenges to remedy alleged prejudice to the defendant result- ‘ ing from the removal of those two jurors.

. The Court in Witherspoon held that:
[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.
Id., 391 U.S. at 522, 88 S.Ct. 1770.

. In Wainwright v. Witt, the court set forth the clarified Witherspoon standard:
[Wlhether the juror’s views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” We note that, in addition to dispensing with Witherspoon’s reference to 'automatic' decisionmaking, this standard likewise does not require that a juror’s bias be proved with "unmistakable clarity,” This is because determinations of juror bias cannot be reduced to question- and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear”; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully infra, this is why deference must be paid to the trial judge who sees and hears the juror, [Footnotes, omitted.]
Id., 469 U.S. at 424-426, 105 S.Ct. 844.

. We note that included in the defendant’s original appellate brief, he argues that the death-qualification voir dire process led to "the selection of a guilt-prone jury.” Wells abandoned this claim. In any case, he cites no jurisprudential authority wherein a trial or appellate court relied on such a theory to reverse a defendant's conviction rendered by a death-qualified jury.

. We note that Wells did testify at trial.

. Under La. C.Cr.P. art. 881.1, the failure to malee an oral objection to the sentence at the time of sentencing or file a timely motion to reconsider sentence, setting forth the specific ground of excessiveness, shall preclude the defendant from raising the claim of excessive *308 ness on appeal or review. This court has held that the failure to file a motion to reconsider sentence or orally object to the sentence at the time it is imposed precludes a defendant from raising a claim about his sentence on appeal. State v. Mack, 12-0625, p. 6 (La.App. 4 Cir. 5/6/15), 162 So.3d 1284, 1288, quoting State v. McCarthy, 12-0342, pp. 3-4 (La.App. 4 Cir. 3/27/13), 112 So.3d 394, 396-97.
In any case, La. R.S. 14:30.1 B states:
Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
As support for his argument the defendant cites phrases from two decisions by the United States Supreme Court which, by their holdings, do not apply to him.
Wells first cites language from Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), which held that the Eighth Amendment precludes sentencing a juvenile to life imprisonment without the possibility of parole for commission of a non-homicide offense. This decision is inapplicable to the defendant, who was not sentenced for commission of a non-homicide offense, nor was he a juvenile when he committed the crime for which he was convicted and sentenced.
He also cites language from Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), which held that a sentence of mandatory life imprisonment without parole for those under the age of eighteen at the time of their crimes violates the Eighth Amendment's prohibition on "cruel and unusual punishments,” This decision is likewise inapplicable to Wells, who was not under the age of eighteen when he committed the crime for which he was convicted and sentenced.